Morteza Benjamin Ray Kraimi
14004 Merseyside Dr.
Pflugerville, Tx 78660
(512)969-0934
nyccarini@hotmail.com

MORTEZA BENJAMIN RAY KARIMI, IN PRO PER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| MORTEZA BENJAMIN RAY KARIMI | ) Case No.: 3:17-cv-05702-JCS |
| Plaintiff, | ) **REPLY BRIEF IN SUPPORT OF MOTION** |
| | ) **FOR PRELIMINARY INJUNCTION AND** |
| vs. | ) **TEMPORARY RESTRAINING ORDER** |
| GOLDEN GATE SCHOOL OF LAW, et al, | ) **DATE:  JANUARY 19, 2018** |
| | ) **TIME:  9:30 A.M.** |
| | ) **COURTROOM:  G** |
| Defendants. | ) |
| | ) Judge:   Hon. Spero |
| | ) Filed:    December 29, 2017 |
| | ) Trial Date: Unassigned |
| | ) |

**ATTACHED DOCUMENT(S):**

    1.    **EXHIBITS.**

1

**<u>TABLE OF CONTENTS</u>**

2   **I.**   **ISSUES TO BE CONSIDERED** ................................................................. **1**

3   **II.**   **FACTS** ................................................................................................... **1**

4   **III.**   **INACCURACY OF DEFENDANTS OPPOSITION AND DISPOSITIONS** ............ **3**

5   **IV.**   **ARGUMENT** ......................................................................................... **7**

6   **V.**   **CONCLUSION** ...................................................................................... **14**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

3

4

**FEDERAL CASES**

5

6

*Boucher v. School Bd. of School Dist. of Greenfield*, 134 F.3d 821 (7th Cir. 1998) …………… 13,14

7

*Mou v. W. Valley College*, 2009 U.S. Dist. LEXIS 59615 (N.D. Cal., June 29, 2009) …………… 13

8

*Texas v. Johnson*, 491 U.S. 397 (1989) ……………………………………………………… 10

9

10

11

**STATE CASES**

12

*Campanelli v. Regents of the University of California*, 44 Cal.App.4th 572 (1996) ……………… 12

13

14

*Jensen v. Hewlett-Packard Co.*, 14 Cal. App. 4th 958, 969, 18 Cal. Rptr. 2D 83 (1993) ………… 12

15

*State v. Drahota,* 280 Neb. 627 (2010) …………………………………………………….. 9

16

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) …………….. 8

17

18

19

**FEDERAL STATUTES**

20

21

U.S. Const. Amend. I ……………………………………………………………… 1,7,9

22

23

24

**STATE STATUTES**

25

Educ. Code § 94367 …………………………………………………….. 1,7,10,14

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   ISSUES TO BE CONSIDERED

Plaintiff ("Karimi") files this brief in response to Defendants (GGU) opposition of Karimi's motion for injunctive relief. The issues that should be decided are if (1) GGU accurately portrayed the events between Karimi and GGU, (2) GGU accurately portrayed Karimi, (3) GGU has shown to be fair in dealing with Karimi, (4) GGU followed its own rules as stated in the student handbook, (5) GGU has violated California Education Code § 94367 and therefore violated Karimi's First Amendment right (6) a disciplinary hearing will be fair, (7) the disciplinary hearing is merited and, (8) Karimi has already been harmed by GGU's actions.

## II   FACTS

Karimi moved from China to San Francisco to attend GGU. Karimi was awarded a merit scholarship that significantly reduced Karimi's tuition. Karimi paid for tuition via a private loan.

Karimi was harassed by a student in his torts class on August 18, 2017. Karimi reported the incident to administration to where he was suggested to switch seats. Karimi changed seats but was then requested by the professor to switch seats again because another student did not want to sit next to him. After Karimi's refusal to relocate, administration made the student who harassed Karimi move to another seat and Karimi returned to his original seat.

On August 31, 2017, Karimi's torts professor canceled the class scheduled for the next day at the request of a few students who wanted a longer labor day weekend and didn't want to have an absence on their record. The professor initially refused to cancel the class then said he would give a pop quiz. The professor stated that if the whole class scored 100% on the quiz, he would cancel the class. Out of a class of about thirty, less then ten got 100%. Karimi complained to the professor and to administration but no compensation was given. Karimi sent an email to classmates requesting

them not to ask for classes to be canceled. At the next class, the torts professor made an announcement in the next class that he would cancel class whenever he feels it necessary and the class applauded. The dean and the professor notified Karimi that if the professor feels like the students are caught up, the professor may cancel class. Karimi in turn sent an email to his classmates and the professor stating his objection to the professors speech. Karimi received hostility from this in the form of an email which was shared with the whole class.

During the earlier part of September, students started giving announcements in class. Such announcements consisted of promotion of student groups and bids for student elections. Students would use class time at the beginning of class and at the end of class. Professors would give time for students to make such announcements. Sometimes, the professor gave no such permission and students would commence their announcements before class and continue well after class time started. Sometimes the professors would give twenty minutes or more of class time for certain students to give their announcements. Karimi sent an email to classmates that class time should be reserved only for class material and that he did not appreciate having been forced to listen to such announcements. Karimi also states his opinion on a particular student group. Karimi had also complained about a teacher that day.

On the same day Karimi sent his emails regarding class announcements, he was put on interim suspension by the dean. Karimi tried to call and email the dean but the dean did not respond in kind or in a timely manner. The dean did not give any charges or reason for the suspension. Later the next week, the dean tried to persuade Karimi to withdraw under threat of a disciplinary hearing that would tarnish Karimi's record. The dean still did not specify charges. The dean would not allow Karimi to return to campus in the meantime. The dean offered a tuition refund in return for withdrawal.

Karimi requested to deal with another GGU representative besides the dean. Karimi's

situation was transferred to Vice President of Academic Affairs Barbara Karlin ("Karlin"). Karlin offered the same as the dean. Karimi wrote a letter of requests to the school stating what he expected to be compensated for. Karlin denied anything more than a tuition refund at first. Later, Karlin agreed that GGU would pay some extras on top of the tuition. Things such as relocation costs, books, etc. The condition was that Karimi would withdraw and sign a release of claims. Karimi refused. Karimi was then contacted by Associate Dean of Academic Affairs Mark Yates ("Yates"). This time, GGU would offer the same only that Karimi did no have to sign a release of claims. Karimi again refused.

The nature of the case adversely impacts Karimi's chances of getting into another law school so Karimi wished to stay enrolled at GGU in case he would not be able to get into another law school

Karimi was then contacted about two and a half months later by Assistant Director of the Office of Student Conduct and Professionalism Dan Devoy ("Devoy") stating that he would like to speak with Karimi about his claim against the school. Karimi was confused as he was told before that GGU was represented and that GGU's counsel would be dealing with him now. It was later reveled that the said representative was initiating disciplinary proceedings against Karimi. Karimi in turned filed for injunctive relief out of fear of the certainty that any internal disciplinary from GGU would result in his expulsion.

## III.    INACCURACY OF DEFENDANTS OPPOSITION AND DISPOSITIONS

GGU has shown to be vague and inaccurate not only in its opposition, but also in its claims against Karimi.

GGU states that Karimi solicited students to sue the school and file a complaint with the ABA. Docket ("Dkt.") # 24, p. 2:27-28. While it is true that Karimi encouraged students to file a complaint with the ABA, it is not true that he solicited other students to sue, nor did Karimi even

1   state a plan to sue GGU to other students. None of GGU's exhibits show Karimi stating a plan to

2   sue to students or soliciting other students to sue GGU. Karimi said he would sue in emails sent to

3   various administration members regarding the canceled class. Niedwiecki Deceleration ("Decl.") ¶

4   23, Exhibit ("Exh.") 1.

5

6       GGU states that Karimi was instructed by the dean to stop emailing the class. Dkt. # 24, p.

7   3:6-8. The dean also states that a professor informed the class that they were not to use the "master

8   class email list" for personal grievances. Niedwiecki Decl. ¶ 25. The dean also states that he

9   informed Karimi not to use "TWEN" or any other tool to email his class and that Karimi agreed and

10  such was confirmed on September 12, 2017 and September 14, 2017. Niedwiecki Decl. ¶ 26. Such

11  declarations made by the dean are false. Karimi was specifically told not to use "TWEN" and

12  "TWEN" only in the email from said professor. Exh. 2. The dean is also false in that Karimi was

13  never told not to use any "other tool" to contact his class on the email sent to Karimi by the dean on

14  September 12, 2017 or anytime before that. Karimi was told specifically not to use "TWEN" in that

15  email. Exh. 3. There is no mention of "other tools." Karimi never used "TWEN" to contact students.

16  Karimi was told not to use any "other tool" on September 14, 2017, the same day he was suspended.

17  Exh. 4.

18

19      The dean was aware of emails Karimi sent to the class before the dean told Karimi not to use

20  "TWEN" but did not inform Karimi not to email the class using "TWEN" until about a week later

21  after Karimi's emails pointing out GGU's ABA probation history, previous lawsuits, and low bar

22  passage rate. This is shown by an email sent to Karimi by the dean explaining the class cancellation

23  on September 6, 2017. Exh. 5. Nowhere in the email does the dean instruct Karimi not to email his

24  class.

25

26

27

28

---

4

The dean also states that Karimi broke said instructions on dates before such instructions were even given. The dean states he gave Karimi instructions on not contacting the class on September, 12 and September, 14. Niedwiecki Decl. ¶ 26. He then states that Karimi emailed his class "contrary to these instructions" on September, 6, September, 7, September, 14, and September, 18. Niedwiecki Decl. ¶ 27. The dean also shows such inconsistency in his letter to Karimi about withdrawal options. The dean gives conflicting dates to make a decision by stating Karimi has ten days then stating that Karimi has seven days to make a decision. Exh. 6.

GGU states that the student handbook states that the dean has the authority to place someone on interim suspension "pending charges." Dkt. # 24, p. 9:10-11. However, the student handbook states "pending action on charges … as determined by the Assistant Director and approved by the dean:." Exh. 7.

GGU conveniently misquotes the student handbook in one part of its argument by stating that the handbook says "pending charges" and "pending action on charges" in another part. Dkt. # 24, p. 9:11, p. 12:17. GGU tries to justify its actions by alleging charges need not be formally charged but does not realize that there must be a charge of some kind for a student to be placed on interim suspension. If there is a charge, the charged student must be notified of the specific charges and how they may have broke student conduct code. The dean further violated student handbook procedure by not submitting the complaint form as soon as possible after the event took place. Exh. 8. The dean submitted a complaint to Devoy on or about November 28, 2017, two and half months after Karimi was placed on suspension. Devoy Decl. ¶ 16.

GGU does not mention the role of the Assistant Director in its quote from the student handbook. Dkt. # 24, p. 12:13-20. As stated in the student handbook, circumstances under which a student can be placed on interim suspension is determined by the Assistant Director and approved

by the dean. Exh. 7. Karimi was placed on interim suspension unilaterally by the dean with no communication from the Assistant Director or notification of charges. Exh. 9. GGU also broke handbook procedure when the dean did not submit his complaint as soon as possible after the event took place. He waited two and a half months after attempts to make Karimi withdraw failed. Exh. 8.

The dean contradicts himself between his declaration and the security alert he sent to students regarding Karimi's presence on campus on September 15, 2017. The dean states that Karimi refused to leave campus. Niedwiecki Decl. ¶ 35. However, in his security alert the dean states that Karimi left on his own accord and without resistance. Exh. 10. The dean also does not specify the context in which the police were called or on Karimi's presence at the school. Niedwiecki Decl. ¶ 35. Karimi requested for police to be called in an attempt to get back into class. Karimi had already been outside of the GGU building for about ten or fifteen minutes before police came. GGU security did not instruct Karimi to leave campus, Karimi did not want to be inside the GGU building and went outside to wait for the police at his own will.

Councel for GGU, Stacey Leask ("Leask") [SBN 233281] stated in his/her deceleration that parties met and conferred by telephone to discuss ADR options. Leask Decl. ¶ 23. Karimi never spoke on the telephone with opposing party about ADR options and Karimi has never spoken with counsel for GGU by phone. Leask stated that conferring by email was sufficient and that a phone call was unnecessary. Exh. 11.

GGU misrepresents the manner on how GGU handled the harassment complaint Karimi made. Dkt. # 24, p. 10:26-11:2. GGU does not state how the student who harassed Karimi was not made to change seats until another student complained of sitting next to Karimi after Karimi changed seats at the suggestion of administration. Karimi was not satisfied with the handling of the situation and continued to feel unsafe around the student, which he informed GGU of, by meeting

with administration and by email. Exh. 12. Karimi told Director of Law Student Support Jessica Bride ("Bride"), that he wanted the student to stay away from him. Exh. 13.  Karimi was told by Bride that she had spoken with the student and there should be no more issues. Exh. 14. However, later that day, the student who harassed Karimi interjected himself into a group study session Karimi was having in the library and proceeded to interrupt conversations Karimi was having. Exh 15.

GGU contradicts itself on what it defines as discipline. Devoy states that the interim suspension was not disciplinary. Devoy Decl. ¶ 33.  However, an email sent to Karimi by Karlin clearly states that the withdrawal offer the school is offering to Karimi is based off of a disciplinary complaint. Exh. 16.

GGU states that Karimi was unhappy with a professor's "postponement" of one class in conjunction with labor day weekend. Dkt #24, p. 4:19. However, the professor clearly canceled the class and refused to offer any sort of makeup. Exh. 17.

IV.    **ARGUMENT**

GGU has punished Karimi in violation of California Education Code § 94367, also know as The Leonard Law, which GGU does not argue against in its opposition even though Karimi explained it in his motion. California is unique in that it is the only state that grants First Amendment protection to students at private institutions. The law also states that students may file civil law suites and seek injunctive relief when an institution violates this law. Educ. Code § 94367 (b). Because of this, GGU is trying to define Karimi's speech as "conduct" that was malicious and unprotected. Karimi's speech is in the form of a complaint. GGU states that other students felt uncomfortable around Karimi and some felt physically insecure. The dean alleges that Karimi's emails were the source of such discomfort. GGU has not identified any hostile, aggressive, vulgar,

7

or any other malicious content in Karimi's emails nor any such actions from Karimi. GGU asserts that Karimi's emails, in themselves, are hostile. The dean states that because of these circumstances, there was disruption and potential for future disruption. The dean is vague on "safety" and "other security" in his declaration. Niedwiecki Decl. ¶ 29. GGU alleges that Karimi's emails were disruptive and if Karimi is to remain at school, there will be further disruptions.

To see if Karimi's speech was disruptive we can use the *Tinker* standard. "Undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508, 89 S. Ct. 733, 737, 21 L. Ed. 2D 731 (1969) The court wrote: "the record does not demonstrate any facts which might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." *Id. at* 514. GGU has not shown any conduct from Karimi that shows he made a substantial disturbance or interfered with school activities in any way or that he would do so in the future. Karimi's emails were sent from home and no disturbance or disorders on the school premises occurred. The deans fear of a disturbance is undifferentiated in that he states only a few students felt unpleasant feelings because of Karimi's complaints and that the students only experienced unpleasant feelings. Karimi never targeted or harassed any students, so it means that they were just simply offended by Karimi's complaints. A professor even stated that Karimi's emails upset the class. Exh. 18.

Ironically, the basis of Karimi's complaints were to end class disruptions such as arbitrarily canceling class and using class time for purposes unrelated to class material. Karimi emailed his classmates only, the same classmates that hear him speak in class. Everyone has a right to express concern on their education which they paid for. As expressed in *Tinker*, one can not be punished simply for taking an unpopular position. Speech can not be censored just because it makes others uncomfortable. *Id*.

8

There is another case where a person sent emails that offended another but such speech was found to be protected under the First Amendment. *State v. Drahota*, 280 Neb. 627 (Neb. 2010). In *Drahota*, the Court stated certain types of speeches that are not protected and those were libel, obscenity, incitements of imminent lawlessness, true threats, and fighting words. *Id*. Karimi's emails fit none of such categories nor does GGU show that they do. Drahota even intentionally emailed the other person after being told not to. Courts found that his freedom of expression triumphed.

GGU also states that Karimi violated requests by a couple of students who told Karimi not to email them anymore. Karimi did remove emails when students requested. Karimi accidentally sent an email to two students who requested to not be sent emails. Karimi apologized for this mistake and assured them it wouldn't happen again. Exh. 19. Karimi has received requests before from students that did not want to be emailed to which Karimi obliged. Karimi did not intentionally contact those students who requested not to be emailed.  In one situation, a student requested for Karimi to stop contacting her. Karimi obliged. The student then contacted Karimi to express aher beliefs. Exh. 22.

Some students responded to Karimi in a hostile manner that was sent to the whole class, Calling Karimi a "bully" and a "coward". Exh. 20, 21. This clearly shows Karimi being insulted in front of the whole class when Karimi used no such language and named no one. GGU did not punish these students. Karimi even complained to administration but received no response.

GGU states that Karimi made no constitutional or statutory claims in his Complaint that was filed on October 3, 2017. Dkt. # 24, p. 15:21. However, Karimi was not notified of the charges from GGU until December 1, 2017, two months after Karimi filed the Complaint. Without notification of the charges, Karimi had no way of pointing out with certainty the violation of specific statutes or

9

1   Constitutional rights. The charges specified in the deans complaint pertained to Karimi's emails

2   sent from off campus. After knowledge of this, it became clear GGU violated California Education

3   Code § 94367.

4        The dean also states in his complaint that Karimi did acts that were harmful to other people.

5   However, Karimi never committed any acts and the dean does not specify any actions from Karimi

6   besides sending emails. Karimi's emails were speech, not actions. In his complaint, the dean states

7   that Karimi's emails were aggressive and racially charged. Karimi had sent an email (off campus)

8   requesting students to not make student announcements during class time and stated his opposition

9   to ethnocentric groups. There was no aggressive or racist language on Karimi's part whatsoever. In

10   fact, it was another student who endorsed ethnocentric groups. Exh. 24, 25.

11        The dean states that students met with him and Yates regarding the emails stating that they

12   were concerned with their safety. The dean states that one student expressed the sense of being the

13   target of the emails and one student feared expressing personal opinions in class out of fear of a

14   future email from Karimi. Karimi, however, sent the emails to the whole class and therefore did not

15   demonstrate targeting a particular student. Feeling offended by ones opinions alone is no grounds

16   for punishment. "Expression may not be prohibited on the basis that an audience that takes serious

17   offense to the expression may disturb the peace." *Texas v. Johnson*, 491 U.S. 397, 397–98, 109 S.

18   Ct. 2533, 2536, 105 L. Ed. 2D 342 (1989).

19        GGU also conveniently leaves out the role of Yates. Yates attempted to convince Karimi to

20   withdraw. He, like the dean, stated that Karimi could have a clean record if he withdrew. Exh 26. In

21   a conversation with Yates by telephone, Yates stated that Karimi was not a lawyer when Karimi

22   stated that he could seek injunctive relief to return to GGU. Yates also sent a condescending email

23   to Karimi after his attempts to persuade Karimi to withdraw failed. Yates, in his official capacity as

10

a lawyer, informs Karimi that he is harming himself for not accepting his advice. Exh 27. The attitude by Yates, along with the general treatment of Karimi by GGU, shows GGU's contempt for Karimi and a strong bias against *pro se* litigants. The dean even verbally stated to Karimi that GGU could handle a lawsuit and that it was nothing new for them.

GGU alleges that there were numerous complaints but does not go into detail about the number and has only specified two students who felt uneasy about Karimi's emails. GGU took action against Karimi based on the complaints of a few students who did not like what Karimi was saying and such students who complained directly to the dean are likely the same students who arbitrarily requested the cancellation of that class that Karimi objected to. There were a number of students who supported Karimi's objections. Exh. 28.

Such actions taken by the dean are outrageous. In a civilized society, we do not indefinitely punish someone without charging them. If we charge someone, we give specific charges and make sure those charges have merit. We do not simply punish someone for expressing a complaint that is unpopular. Karimi sent emails to his classmates regarding class time. He harassed or targeted no one. In fact, Karimi was harassed and humiliated in front of the whole class. The dean even sent a security GGU community about Karimi, advising that Karimi was not to be on campus. Niedwiecki Decl. ¶ 33.

Karimi was trying to get the most out of his education as his wife and two children are depending on him. Karimi even begged the dean to let him go back to school. Exh. 29. Karimi explained to the dean how he had a family and a father to take care of. Karimi also explained to the dean that his family is poor and are depending on him to succeed as a lawyer. Exh. 30, 31.  Karimi also told the dean how Karimi was having severe mental and emotional distress. The dean did not respond to these pleas and instead pressured Karimi to withdraw.

**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER  3:17-cv-05702-JCS**

1

2        GGU does not explain its use of citing *Campanelli v. Regents of the University of*

3   *California*. Dkt. # 24, p. 13:13-16. GGU states that Karimi offers no evidence of any statement by

4   the dean that constitutes defamation. Dkt # 24, p. 13:25-28. Karimi attached a copy of the security

5   warning issued by the dean in his motion for an injunction. GGU does not apply a defense to the

6   security warning that defamed Karimi, which depicted him as a serious threat.

7        "[T]he dispositive question ... is 'whether a reasonable fact finder could conclude that the

8   published statements imply a provably false factual assertion.' "*Jensen v. Hewlett-Packard Co.*, 14

9   Cal. App. 4th 958, 969, 18 Cal. Rptr. 2D 83 (1993). The assertion of fact in the deans security alert

10  is that Karimi was a threat to the safety of students on campus. The dean states that Karimi was,

11  based on their "judgment", displaying behavioral issues at the University. Exh. 10. As we find out

12  later in the deans complaint against Karimi, the behavioral issues were the emails that Karimi sent

13  from home. Not only were these sent from off campus, but they contained no language that could be

14  interpreted as a threat to students safety on campus, nor did Karimi ever display such behavior. Not

15  only is it false that Karimi's alleged "behavior" happened on campus, but the assertion of Karimi as

16  a threat is also false.

17

18       It is obvious that the alert would have an impact on Karimi's reputation. Any reasonable

19  person who reads this alert would have negative thoughts about Karimi.

20

21       The dean also explicitly states that he sent an email to the law school community that

22  Karimi was not to be on campus. Niedwiecki Decl. ¶ 33. Besides other factors, this identifies

23  Karimi specifically.

24

25       GGU states that Karimi can not show irreparable harm and that there is a monetary remedy.

26  GGU does not take into account Karimi's law school application process. Karimi must disclose any

27

28
                                             12

1   disciplinary action taken against him, regardless if it's on record or not. This is irreparable unless

2   Karimi were to lie about it.

3       The dean and various administration at GGU repeatedly inform Karimi that he can start with

4   a "clean slate" if he were to withdraw. GGU implies that Karimi can lie about any questions of

5   discipline when applying to other law school as the disciplinary action is not on his student record.

6
    Exh. 26, 32.
7

8       Interest on the tuition money accrues daily and the future of the case is not certain. Karimi

9   has already missed the first semester to which he paid for by a student loan. Karimi has already lost

10  the fall semester. There is no reason for GGU to keep Karimi's tuition money, especially when one

11  takes into account he was not charged with anything and GGU offers to refund tuition only if he

12
    withdraws.
13

14      The nature of this case coupled with the certainty of expulsion from an internal disciplinary

15  hearing is also irreparable harm. Karimi is trying to get into another law school as soon as possible

16  and is thirty-five years old. It is reasonable to believe that law schools will be more reluctant to

17  admit Karimi should the expulsion occur.
18

19      GGU states that the balance of equities do not tip in Karimi's favor by citing rulings on *Mou*

20  *v. W. Valley College* and *Boucher v. School Bd. of School Dist. of Greenfield*. Both cases are

21  inappropriate to compare to Karimi's. Firstly, *Mou* was for an ex parte motion and Karimi is not
22
    asking for relief ex part. It was stated in *Mou* that Mou confronted staff. *Mou v. W. Valley College*,
23
24  2009 U.S. Dist. LEXIS 59615 (N.D. Cal., June 29, 2009). Karimi never confronted staff. There is

25  not enough information in the cited *Mou* case to know exactly what Mou's behavior was. In

26  *Boucher*, the student was advocating to other students to hack computers which resulted in

27  administrators taking extra measures to secure computers, thus showing a material disruption.

28
                                            13

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield,* 134 F.3d 821, 828 (7th Cir. 1998). Unlike the student in *Boucher*, Karimi did not advocate any students to act in disruptive ways, the only thing he advocated to students were their rights to file a complaint to the ABA.

The dean also states that Karimi "mass emailed" his class. However, the dean has mass emailed the class as well with emails that show a clear political bias. Exh. 33, 34. GGU has also mass emailed students to encourage them to attend a meeting with an agenda to expand the cannabis industry. Exh. 35. Cannabis a schedule 1 drug.  The meeting is run by lawyers advocating for the legalization of marijuana. GGU did not advertise a political ideology or drug legalization advocacy. Karimi found such emails offensive.

## V.       CONCLUSION

By California Education code § 94367 (b) alone, Karimi is entitled to an injunction as seen appropriate by the Court. GGU bases its argument on the assumption that Karimi was disruptive in a sense that Karimi posed a threat to harm others, that Karimi was non compliant to the deans orders to not express himself, and that Karimi would interfere with school operations. In an attempt to justify this, GGU exaggerates and misrepresents the facts. GGU, however, has failed to show that Karimi was disruptive in what the Courts define as disruptive. GGU has also failed to show that Karimi was a threat to other students or that he interfered materially with school operations. GGU has shown to take adverse action on Karimi because of an unpopular position Karimi took.

The fact is that a few students, and a few professors, were angry at Karimi for objecting to the interference of class time and for objecting to professors abetting such interference. The First Amendment was created to protect unpopular speech. Furthermore, the speech was done off campus.

**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER  3:17-cv-05702-JCS**

The dean is also angry at Karimi for not following his orders, regardless if he was in his bounds of authority. The dean attempted to stop Karimi from contacting anyone from GGU, regardless if he was good friends with some class mates. The dean is angry that Karimi did not allow him to violate his right to associate and speak with whom ever wanted to associate with Karimi. GGU, and some students, want to retaliate against Karimi.

Karimi was forced to listen to student announcements unrelated to class material but GGU is not allowing him to address the class with his objection. GGU allows a few students to cancel class for everyone but GGU does not allow Karimi to address the class with his objection.

GGU is trying to create a negative image of Karimi in an attempt to justify their unjust expulsion (under the name of "interim suspension") and attempted censorship of Karimi.

What essentially makes GGU's argument hollow is the content of the emails. GGU attaches hostility on the delivery of the emails, but not the content. And in doing so, they overly exaggerate and mislead one into thinking that the email content was hostile, which was not.


DATED: December 29, 2017

_____
MORTEZA BENJAMIN RAY
KARIMI
In Pro Per

**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER  3:17-cv-05702-JCS**