UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MORTEZA BENJAMIN RAY KARIMI,

Plaintiff,

v.

GOLDEN GATE SCHOOL OF LAW, et al.,

Defendants.

Case No. 17-cv-05702-JCS

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Re: Dkt. No. 18

## I.      INTRODUCTION

Plaintiff Morteza Benjamin Ray Karimi, a law student proceeding pro se, brought this action against Defendants Golden Gate University School of Law ("Golden Gate") and Anthony Niedwiecki, Dean of Golden Gate, asserting diversity jurisdiction for state law claims of breach of contract, defamation, and intentional infliction of emotional distress.  Defendants placed Karimi on interim suspension in September of 2017 and provided him with a formal disciplinary complaint on December 1, 2017.  Karimi now moves for a preliminary injunction and temporary restraining order requiring Defendants to refund his tuition and barring Defendants from proceeding with disciplinary action against him.  The Court held a hearing on April 20, 2018.  For the reasons discussed below, Karimi's motion is DENIED.[1]

## II.     BACKGROUND

### A.     Factual Background

Golden Gate is a private, nonprofit law school located in San Francisco, California and accredited by the American Bar Association and other organizations.  Niedwiecki Decl. (dkt. 25) ¶¶ 6–7.  Karimi relocated his family from China to the United States to attend law school at

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

Golden Gate in the fall of 2017.  Karimi Decl. (dkt. 18) ¶ 3; Niedwiecki Decl. ¶ 18.  Classes began

on August 14, 2017.  Niedwiecki Decl. ¶ 20.

Karimi states that he was harassed by another student in his torts class on August 18, 2017.

Karimi Decl. ¶ 13.  The student, who was sitting behind Karimi, told him to put his hand down,

but Karimi left his hand up and asked the professor if it was acceptable to ask questions, and the

professor responded that it was.  *Id.*  The student behind Karimi then "cursed and threatened [him]

in a low voice."  *Id.*  According to the allegations of Karimi's complaint, the student said, "'You

punk mother fucker ..' to which the rest was not heard clearly by [Karimi]."  Compl. (dkt. 1) ¶ 17.

Karimi left the class immediately in fear and met with Associate Dean of Student Support Jessica

Bride and a security guard, telling them that he felt unsafe and wanted the other student to stay

away from him.  Karimi Decl. ¶ 13.  He later sent an email to his professor apologizing for leaving

early and stating that he "didn't feel safe" because the student behind him "told [him] to put [his]

hand down and not ask questions," and then "cursed at [him]," and Karimi "had to leave and

report it."  Reply (dkt. 32) Ex. 12.

Bride said she would speak with the other student and suggested that Karimi change seats,

which he did, but another student next to his new seat asked the professor to assign Karimi to a

different seat.  Karimi Decl. ¶ 13; *see also* Reply Ex. 13 (email from Karimi to Bride agreeing to

change seats and requesting that the student who cursed at him avoid him in the future); Reply Ex.

14 (email from Bride to Karimi confirming that she had spoken to the student who cursed at him).

Karimi expressed frustration to the professor, and Bride told Karimi that the student who had

cursed at Karimi would move and Karimi could return to his original seat.  Karimi Decl. ¶ 13.

Later, that student joined a conversation that Karimi was part of in the library without invitation

and interrupted Karimi, and Karimi "reported the incident to Bride and was increasingly

concerned with [his] safety."  *Id.*; *see also* Reply Ex. 15 (email from Karimi to Bride).[2]  Karimi is

---

[2] "Thank you.  One thing I'd like to mention is that he joined a study group I was in today and
deliberately tried to engage in the conversation we were having totally uninvited.  He sat down at
the table me and 4 other classmates were sitting, was quite [sic] for a few minutes, then butted in
our conversation. This is something I was worried was going to happen. Could you please
reinform him."  Reply Ex. 15.

not aware of any disciplinary action having been taken against that student.  Karimi Decl. ¶ 13.

When a professor canceled class on the Friday before Labor Day weekend, which was September 1, 2017, at the request of some students, Karimi unsuccessfully requested that the class be reinstated.  Karimi Decl. ¶ 14.  Some students supported Karimi's view that the class should not have been canceled.  Reply Ex. 28.  According to Niedwiecki, the decision to cancel class fell within the discretion of that professor.  Niedwiecki Decl. ¶ 21.  Karimi contacted Golden Gate's student support services and threatened to file a complaint with the American Bar Association and demand reimbursement if the class was not reinstated.  Niedwiecki Decl. ¶ 21.  Karimi also sent emails to the class asking "for students not to request the professor to cancel classes arbitrarily[,] not to promote their student groups or bid for student elections during class time," and not to "talk about personal stories or any other irrelevant topics during class time."  Karimi Decl. ¶ 14.  An email that he sent to his classmates at 4:52 AM on Saturday, September 2, 2017, read in part as follows:

> . . . I believe it is very unfair and inconsiderate to those of us who would like to have class to have the class cancelled at the request of a few. If you do not want to come to class, that is your own personal decision, but it is absurd to have the whole class cancelled just so you wont [sic] have an unexcused absence or for whatever else reason. Many of us pay a lot of money out of our own pockets and have come a long way to be here. Fridays [sic] class was our right to have and it has been taken away from us for no good reason. I do not know about others but I have already paid tuition (plus interest) and I have not received agreed upon service for that class that I had already prepaid for. . . .
>
> The professors have all told us to act in a professional manner and will treat us as a judge would. I do not think a judge would find this professional and I could only imagine what a judge might say or do if we requested to reschedule a court date because we wanted to have a longer labor day weekend. Further more, I think that willing to break the schedule (which you could see as a contract) for a few could also point to favoritism. So logically what follows is compensation for the class. We are even making up for classes that fall on holidays and since the class cancellation of Friday had no good reason, it is even more appropriate to make the class up.
>
> I have taken steps to try and have us compensated for this loss and I encourage all of those to voice your concern to the director and the dean to ensure that we are receiving the education that we paid for because this can not happen again.
>
> I have attached an ABA complaint form to this email.

Niedwiecki Decl. ¶ 22; Defs.' Ex. B.[3]  Karimi states that he sent that email because he "sacrificed a lot to attend law school and took it very seriously."  Karimi Decl. ¶ 14.  Karimi also sent several emails to Jessica Bride, one of which also included Niedwiecki and Academic Dean Mark Yates, ultimately threatening to the sue Golden Gate if he did not receive either monetary compensation or a make-up class.  Niedwiecki Decl. ¶ 23; Defs.' Ex. C; Reply Ex. 1.  Karimi "received hostile emails" in response to the emails that he sent to the class, and "reported the hostile reactions to Bride but received no response."  *Id.*

Karimi's professor, after apparently discussing the issue in class, sent Karimi the following email on September 8, 2017:

> No one wants to attack you. The class has been upset by your email comments, so my class comments were aimed at calming people down by telling everyone that how I run my class is normal and proper, so it's best not to worry about that and focus on academics. I also told the class that it's perfectly fine to have disagreements and there are channels for raising them if you disagree with me. That's nothing personal. I respect the right of any student to do that.
>
> And everyone is expected to act respectfully in class and in school. So no one should be subject to attacks or harassment.
>
> So, good, this matter is closed. I look forward to continuing our class and focusing on rigorous academics.

Reply Ex. 18.

Niedwiecki and others informed Karimi that the professor had discretion to cancel class, and Niedwiecki stated in an email that there was more classroom time on the schedule than was required under Golden Gate's rules, specifically so that professors could cancel some classes in their discretion.  Niedwiecki Decl. ¶ 24; Reply Ex. 5.  Niedwiecki states in his declaration that he also "informed [Karimi] directly that he was not to use the email system known as 'TWEN' or any other tool to email his classmates," and Karimi agreed not to.  *Id.* ¶ 26.  A confirmation email that Niedwiecki sent to Karimi on September 12, 2017 states only that Karimi had agreed not to use TWEN, without mention of other methods of emailing the class.  Defs.' Ex. D; Reply Ex. 3.  An email that Niedwiecki sent on September 14 asked Karimi not to "use TWEN or any other tools to

---

[3] All of Defendants' exhibits are filed at docket entry 29.

email [his] fellow students for any of [his] classes." Defs.' Ex. E; Reply Ex. 4. It is not clear whether Karimi sent any emails to his classmates between when he received the September 14 email and his suspension later that day.

On September 6, 2017, Karimi sent an email to his classmates beginning: "Dear class, Please stick to class topics, do not waste time with your personal stories or other irrelevant discussions. This is a law school not the Oprah Winfrey show." Defs.' Ex. F. The email went on to suggest that Karimi's classmates file complaints regarding the canceled class, and included links to a number of articles discussing Golden Gate students' low rate of passage of the California Bar Examination and a lawsuit against the school, as well as an internet forum post indicating that Golden Gate had been placed on probationary status by the American Bar Association. *Id.* On September 7, 2017, Karimi sent an email to his professor and classmates reading in part as follows:

> Class time should be reserved for relevant materials only and I am sorry Professor Gallagher, you can not cancel classes whenever you please. Class time is for discussing torts and no other matter. It is unprofessional to bring up such issues during class time, which is why I do it through email.
>
> [. . .]
>
> Again, this is a contract with the school to were [sic] I am the buyer and you are the seller. I paid for service (plus interest). Please adhere to your contractual duty to provide the legal education I paid for.

Defs.' Ex. G. One of Karimi's classmates responded that Karimi's approach "IS A JOKE" and that Karimi is not entitled to "play lawyer," and asked that Karimi "stop harassing people with [his] never-ending baseless cowardly emails." Reply Ex. 20. The same day, Karimi's professor instructed him via email that Karimi could not "improperly impose [his] grievances on the rest of the class through the TWEN site." Reply Ex. 2.

On September 14, 2017, Karimi sent an email to his classmates reading as follows:

> Dear class,
>
> Please keep your announcements off of class time.
>
> I also believe that most of your announcements could be made via email.

5

As I stated before, if one person has the right to address the whole class, then so do I.

I would also like to state I am strongly opposed to any ethnocentric groups on campus.

I believe we are all equal and should help each other equally.

Thank you, and have a wonderful day.

Defs.' Ex. H.

Another student responded to that email, stating that "[n]o one is having a wonderful day when they have to wake up to you incessantly chastising what they should or should not do like you're their parent." Defs.' Ex. I. That student accused Karimi of leaving class early and playing chess during class, and defended the existence of "ethnocentric groups" on the basis that they do not require members to be a particular ethnicity and "help anyone who asks for it." *Id.* Karimi responded that "[n]o one has the right to infringe upon class time" and stated that "if someone does something that effects [sic] what I paid for, I will say something about it." *Id.* Karimi disputed the accusations that he left class early and played chess during class, and argued that the campus group La Raza was "akin [to] if a group of white people started a group and called it 'The Aryan Club.'" *Id.* He concluded that "[a]ny attempt to slander me or falsely accuse me of breaking student code conduct will be reported," and "[a]nyone who interferes with class time (that I paid for) will hear from me." *Id.* The student responded again, continuing to debate the equivalence of the La Raza group and the hypothetical "Aryan Club," and asking Karimi to use other means than emailing the whole class to express his concerns. Reply Ex. 25.

One student wrote to Karimi to request "for the last time[,] DO NOT EMAIL ME." Reply Ex. 21. The student called Karimi "a coward and a bully" and threatened to seek a restraining order from the police. *Id.* Karimi responded to one student who had apparently asked to be excluded from his emails[4] as follows:

I am sorry, honest mistake.

---

[4] Because the parties have redacted the names of Karimi's classmates in their exhibits, and because Karimi has submitted emails individually rather than as chains of replies, it is difficult to tell with any certainty which responses correspond to which emails.

Won't happen again.

So this time please be consistent.

Last time you said don't email you but continued to email me.

Sorry again.

However I will contact anyone who interferes with my education.

That means should you ask for any more undue days off from class, you will contacted [sic] about that.

Have a wonderful day,

MK

Reply Ex. 19.

Also in September 14, 2017, Karimi emailed Niedwiecki and a professor to complain that the professor was not treating him fairly by "sometimes ignor[ing] [Karimi] when [his] had was raised" and "abruptly cut[ting] [him] off," but Karimi received no response. Karimi Decl. ¶ 15.

Later the same day, Niedwiecki informed Karimi that he was suspended indefinitely by sending the following email:

> Pursuant to the Standards of Student Conduct, Section J, this is to inform you that effective immediately you are placed on interim suspension from the Law School. You will be informed next week with the details for this suspension.
>
> In the interim and pending receipt of further information from me, you are directed not to come on to campus at any time for any reason unless specifically invited to campus by me. And your access to the library, all electronic research systems, and the GGU email system is discontinued.
>
> You shall not email any other students, faculty, or staff. And you are directed to only communicate with me via email.
>
> If you violate these instructions you be [sic] will be subject to disciplinary action up to and including dismissal.

Niedwiecki Decl. ¶ 32; Defs.' Ex. J; Reply Ex. 9; *see also* Karimi Decl. ¶ 4. Karimi lost access to the Westlaw and Lexis research tools as a result of his suspension. Karimi Decl. ¶ 12.

Niedwiecki states that he based his decision on reviewing Karimi's emails as well as reports from others, and that he concluded "the overall context created by" Karimi had "disrupt[ed] the educational environment for other students" and would continue to do so, that

7

students were concerned "for their emotional and other safety and security while on campus," and that Karimi had disobeyed specific instructions from Niedwiecki and his professor not to email the class. Niedwiecki Decl. ¶ 29. Niedwiecki states that he also determined, based on an investigation by Golden Gate's Behavior Intervention Team, that Karimi might have had a criminal record involving unlawful possession of a firearm, which Niedwiecki states also contributed to his concern. *Id.* ¶ 30. Niedwiecki sent a security notice "to the Law School community" regarding Karimi's suspension and "hire[d] additional security guards to patrol the campus." *Id.* ¶¶ 33–34. According to Dan Devoy, Golden Gate's Assistant Director of the Office of Student Conduct and Professionalism (among other roles), the "interim suspension was appropriate under the circumstances" and Niedwiecki followed appropriate procedures in imposing the suspension. Devoy Decl. (dkt. 27) ¶ 32.

The following day, Karimi came to campus despite Niedwiecki's email placing him on interim suspension and initially refused to leave. Niedwiecki Decl. ¶ 35. Karimi alleges that he "requested police intervention as he felt this was unjust and hoped for police to facilitate his entry into class." Compl. ¶ 24. After the police arrived, Karimi left campus. Niedwiecki Decl. ¶ 35. Karimi sent three emails to Niedwiecki in the days following his suspension, the first asserting that the suspension was invalid, Reply Ex. 31, the second apologizing if he had offended anyone and stating that he would "do whatever it takes to get back in," Reply Ex. 29, and the third stating that he was in "sever[e] distress" and had not slept in two days, concluding as follows:

> Is this what you stand for? Suspend people for no reason and do not even respond to them with no idea what to do or when to return?
>
> You don't think this is harsh and realize how you are adversely effecting [sic] my life, family, and my future?
>
> You have Jessica Bride and security guards spy on me in the library instead of coming to me yourself or calling me in a respectful manner to talk about the issue? You have police come[5] and then lock doors for 'security' making me look like some kind of criminal?

---

[5] Despite this assertion in Karimi's email, there appears to be no dispute at this point that Karimi, rather than Golden Gate or Niedwiecki, called the police to campus. *See* Compl. ¶ 24 ("Plaintiff requested police intervention . . . ."); Reply at 6 ("Karimi requested for police to be called in an attempt to get back into class.").

1    Do you realize the harm you are causing me and my family? Do you
2    have any decency?

3    You have a responsibility to talk with me and work this out now. I am
     losing school time.

4    We have a contract and you have clearly violated it.

5    and could be punished by the ABA for lost time.

6    YOU CAN NOT DO THIS!!!!

7  Reply Ex. 30.

8        Niedwiecki sent an email to Golden Gate students on September 18, 2017 that read as

9  follows:

10   GGU Students,

11   I am writing because there has been some inquiry about a matter that
     happened last Friday morning.

12
13   At approximately 9:10 AM, we requested a law school student, who
     in our judgment has been demonstrating some behavior issues at the
     University, to leave campus for an indefinite period of time. The
14   student has left the campus on his own accord without resistance. We
     plan to communicate with this student while he remains off campus.

15
16   You might have observed some campus security or SF police near the
     Hub at that time, but there was no known safety concern. We are
     continuing with heightened safe [sic] and security procedures for the
17   time being.

18   If you have any questions about this situation, please don't hesitate to
     contact me at [telephone number].

19
20   Thank you all for your patience,

21   Anthony Niedwiecki
     Dean, GGU Law School

22  Karimi Decl. ¶¶ 9–10 & Ex. 1; Reply Ex. 10.

23       Karimi then sent the following email to his classmates:

24   I was not going to contact any of you but what the Dean is saying is
     totally false.

25
26   You never "requested" me to leave campus, you "directed["] me as
     stated in your email to me and then your security guards spied on me
     and intercepted me in the library and took me to a room with your
27   suspension letter (attached). Then you "directed" me not to speak with
     anyone affiliated with the school.

28

9

You did not even come down to speak with me.

The police came at my request to show that what you are doing is against the rules since I HAVE ALREADY PAID YOU!!.

Since I am one man and you are the "dean" and you don't want me on campus for reasons you have not stated, the police said if I come back I would be trespassing, so I left out of fear of going to jail.

You can not interim suspend me without first presenting me with the charges or pending a hearing. THIS IS CLEARLY STATED IN YOUR HANDBOOK!!!

You have given no reason since Thursday of your suspension and I have never been aggressive or have even spoken with anyone who does not wish to speak with me. All I did was send some emails so people would take the class more seriously and now you are destroying my life and my ability to take care of my wife and 2 children who are living on welfare and depending on me to succeed. You hung up when I called you, you do not respond to my emails, you have made no attempts to communicate with me after expressing the extreme distress you are causing me.

Now you lock the doors and call security on the premises to make me seem like a boogie man or something. You are causing me extreme distress. You are supposed to keep these matters CONFIDENTIAL to boot. This is a school not a prison, you are not a warden, and I AM NOT CRIMINAL!

I HAVE NEVER HURT OR THREATENED ANYONE!!!! I JUST ASKED STUDENTS TO STOP CANCELLING CLASSES AND HAVING ANNOUNCEMENTS THAT INTERFERE WITH CLASS TIME. SOME OF OUR LIVES AND FAMILIES ARE DEPENDING ON THIS EDUCATION.

Defs.' Ex. I.

After Karimi tried to contact Niedwiecki about the suspension, Niedwiecki presented him with two options by letter dated September 19, 2017: (1) Karimi could voluntarily withdraw from Golden Gate within either seven or ten days of Niedwiecki's letter (different parts of the letter stated different deadlines) and receive a refund of his tuition without any formal record of discipline appearing on his academic record; or (2) Niedwiecki would submit a formal complaint that Karimi had not followed his "directions with regard to communications with others," and proceedings would commence that could lead to "various forms of discipline . . . ranging from warning through suspension to expulsion." Karimi Decl. ¶ 4; Niedwiecki Decl. ¶ 39; Defs.' Ex. K; Reply Ex. 6. In an accompanying email, Niedwiecki told Karimi that he might need to bring disciplinary charges based on "the numerous complaints from other students and [Karimi's] failure

to follow [Niedwiecki's] directives not to email [the] entire class," and that Niedwiecki was "the final decision maker" and thus "the only person who can handle this matter."  Reply Ex. 32.

Niedwiecki states in his declaration that the offer to allow Karimi to withdraw and receive a refund was based on Niedwiecki's conclusion that Karimi's "behaviors were demonstrating his unlikely ability to be successful in the program."  Niedwiecki Decl. ¶ 40.  In an email dated September 20, 2017, Niedwiecki told Karimi that he would prefer not to bring formal disciplinary charges because doing so might affect Karimi's ability to obtain admission to a different law school, but that he might need to do so if Karimi did not withdraw.  *Id.* ¶ 41; Defs.' Exs. L, M. Karimi responded that he would not accept that offer because it did not account for interest on tuition, costs of relocation, and the delay of Karimi's legal career, and stated that although he was open to negotiation he would prefer to negotiate with someone other than Niedwiecki, to which Niedwiecki responded that Karimi could communicate with Barbara Karlin, the Vice President of Academic Affairs.  Niedwiecki Decl. ¶ 43; Defs.' Exs. L, M.  Karlin offered to refund Karimi's tuition, books, and interest he paid on his loans, but stated that Golden Gate could not offer anything more "[b]ecause this is based on a discipline complaint."  Reply Ex. 16.  The parties continued to discuss a resolution, but were not able bridge the gap between Golden Gate's offer of a $6,500 tuition refund[6] and Karimi's request for $175,000, with a predicted salary of $120,000 for a lawyer in San Francisco accounting for much of the latter.  Niedwiecki Decl. ¶¶ 46–50; Defs.' Ex. N.

Karimi filed this action on October 3, 2017.  *See generally* Compl. (dkt. 1).  Mark Yates, Golden Gate's Associate Dean for Academic Affairs, sent Karimi an email on October 11, 2017 requesting to talk to him, and Karimi spoke to Yates by telephone.  Karimi Decl. ¶ 11.  Yates offered Karimi the opportunity to withdraw from Golden Gate and receive a $6,500 refund without releasing any claims so that he could apply to other law schools with a "clean record," but Karimi responded that he could not do so because other law schools required applicants to disclose any disciplinary actions taken against them, and that he was not willing to withdraw from Golden

_____

[6] The $6,500 figure appears to have been based on the fact that Karimi received a $40,000 scholarship and thus did not pay the normal tuition for Golden Gate.

Gate because he might not be accepted by other schools.  *Id.*; Reply Ex. 26.  After Karimi

"informed [Yates] that [Karimi] could use an injunction to achieve going back to [Golden Gate]," Yates told Karimi that Karimi was "not a lawyer," and that Karimi, like some of Yates's clients in his practice as a lawyer, was harming himself by refusing to accept Yates's advice.  Karimi Decl. ¶ 11; Reply Ex. 27.  Yates concluded, "It's your call, I did my best."  Reply Ex. 27.

On November 2, 2017, Defendants' outside counsel contacted Karimi and instructed him to communicate with counsel regarding his lawsuit, rather than with Golden Gate directly.  Karimi Decl. ¶ 5.  Assistant Director Devoy contacted Karimi by email on November 28, 2017 asking to speak to Karimi by telephone.  *Id.* ¶ 6; Devoy Decl. (dkt. 27) ¶¶ 2, 19; Defs.' Ex. U.  Devoy and Karimi exchanged emails on November 28 and 29, with Karimi suggesting that Devoy had a conflict of interest in resolving the dispute because he worked for Golden Gate, and Devoy again asking whether Karimi was available to speak to him.  Devoy Decl. ¶¶ 19–20; Defs.' Ex. V.

Niedwiecki filed a formal complaint with Devoy on or about November 28, 2017, charging Karimi with disruptive or unprofessional conduct, failure to comply (specifically, with instructions not to email his class and with the terms of his interim suspension), and acts harmful to others (including sending "aggressive" and "racially charged" emails that had the effect of discouraging students from attending class and contributing to discussions).  Niedwiecki Decl. ¶¶ 51–53; Devoy Decl. ¶ 16; Defs.' Ex. O.  Golden Gate's outside counsel sent Karimi an email on December 1, 2017 attaching the complaint form completed by Niedwiecki and stating that Karimi must submit a response by December 15, 2017.  Karimi Decl. ¶ 7; Devoy Decl. ¶ 18; Defs.' Ex. T; Reply Ex. 23.

Karimi emailed Devoy on December 15, 2017 attaching his present motion and supporting documents and explaining that they "pretty much sum[] up [his] defense."  Devoy Decl. ¶ 22; Defs.' Ex. W.  Devoy responded on December 19 that he had reviewed those documents and added them to Karimi's file for the ongoing disciplinary proceedings.  Devoy Decl. ¶ 23; Defs.' Ex. X.  The next day, December 20, 2017, Devoy sent Karimi a "Disciplinary Action Letter" setting forth Devoy's conclusions.  Devoy Decl. ¶ 24; Defs.' Ex. Y.  Devoy concluded that Karimi "engaged in behavior that violated the Standards on Student Conduct by engaging in disruptive

and unprofessional conduct; by engaging in acts harmful to other persons; and by failing to comply with instructions." Devoy Decl. ¶ 25; Defs.' Ex. Y. The letter set forth options for Karimi to engage in an informal resolution process, appeal to the Associate Dean, or resolve the matter through a formal hearing, with the latter two options to be completed no later than January 31, 2018. Devoy Decl. ¶¶ 26–28; Defs.' Ex. Y. The letter noted that Karimi could appear at an informal meeting or a formal hearing via videoconference if he so chose. Devoy Decl. ¶¶ 26, 29; Defs.' Ex. Y.

At the time that he filed his present motion, Karimi was in the process of applying to other law schools, and was required by those schools "to disclose any previous law schools attended and deliver all records from previous law schools." Karimi Decl. ¶ 8. Karimi states that one other law school had at that time denied him admission. *Id.* Golden Gate's registrar, Steven Lind, states that he is not aware of Karimi having requested a "transfer out package" to apply to other schools, and that Karimi's transcript did not (at the time of Defendants' opposition brief) include any record of disciplinary action. Lind Decl. (dkt. 26) ¶¶ 13, 19.

Karimi has "been severely depressed and anxious" since his suspension because he has "unexpectedly been thrown into the job market, unprepared, with a family to provide for." Karimi Decl. ¶ 16. He cannot work as a teacher in Texas, as he did in China, because he does not have a teaching certificate. *Id.*

Karimi presents evidence that Golden Gate and Niedwiecki emailed the student body about, and otherwise discussed or took positions on, political issues including immigration and cannabis. Reply Exs. 33–35. The Court does not find any such positions to be relevant to the present motion.

### B. The Golden Gate Handbook

In potentially relevant part, the Golden Gate Student Handbook (the "Handbook") prohibits:

> [E]ngaging in acts of disruptive or unprofessional conduct, such as:
>
> a. Obstruction of, disruption of, or tampering with any School of Law or University activity, including teaching, research, administration, disciplinary, or public service functions, or of any activities authorized or supervised by the School of Law or the

University, including elections for any School of Law organization.

[. . .]

[E]ngaging in acts that are harmful to other persons, defined as:

a.  Physical abuse, verbal abuse, threats, intimidation, harassment, and/or any other such conduct that threatens or endangers the health or safety of any person.

[. . .]

[E]ngaging in acts constituting a failure to comply with administrative rules and procedures, such as:

[. . .]

c.  Failure to comply with directions of the School of Law or University employees, officials, or law enforcement officers acting in performance of their duties . . . .

Niedwiecki Decl. ¶ 12; Defs.' Ex. A (Handbook) at 103–04, §§ XVI.D.5–7.

The Handbook's code of conduct applies to student conduct that "occurs on or adjacent to the property of Golden Gate . . . or otherwise occurs in connection with any activity or program operated or sponsored by the University," as well as any conduct "which, in the judgment of School officials, bears upon the student's ethical and moral fitness to practice law . . . wherever such conduct occurs." Niedwiecki Decl. ¶ 11; Defs.' Ex. A (Handbook) at 98, § XVI.B. Any member of the Golden Gate community may submit a complaint against a law student for engaging in prohibited conduct by filing a complaint form with the Office of Student Conduct & Professionalism. Niedwiecki Decl. ¶ 15; Defs.' Ex. A (Handbook) at 104, § XVI.F.1. "The complaint form is to be submitted as soon as possible after the event takes place and no later than one year from the date of the conduct forming the basis of the complaint." Defs.' Ex. A (Handbook) at 105, § XVI.F.1. A complaint triggers a process including an investigation and determination by the Assistant Director of Student Conduct & Professionalism, followed by either an informal resolution process or formal hearing process, at the choice of the student. *Id.* at 104–07, § XVI.F. Students are afforded a number of procedural rights, including the rights to present witnesses and evidence, cross examine the complainant and other witnesses, hire an attorney in an advisory capacity, and appeal a decision to the Dean. *Id.* at 107–110, §§ XVI.G–I. Disciplinary

14

proceedings may occur "before, simultaneously with, or following civil or criminal proceedings." Devoy Decl. ¶ 9; Defs.' Ex. A (Handbook) at 104, § XVI.E. Possible sanctions for a finding of misconduct range from a warning to expulsion, and can include monetary penalties. Defs.' Ex. A (Handbook) at 110–111, § XVI.K.

The Handbook also provides for the possibility of interim suspension before a finding of misconduct, as follows:

> Pending action on charges, a student's status as a member of the University community will not be altered or his or her right to attend classes or perform his or her prescribed duties suspended, except under any of the following circumstances as determined by the Assistant Director and approved by the dean:
>
> 1.  To ensure the safety and well-being of members of the University community or preservation of University property;
>
> 2.  To ensure the student's own physical or emotional safety and well-being;
>
> 3.  If the student poses a credible threat of disruption of or interference with the normal operations of the University; and/or
>
> 4.  If the student fails to attend the scheduled hearing on the disciplinary charges.
>
> During the interim suspension, the student shall be denied access to University facilities including classes, and/or all other University activities or privileges for which the student might otherwise be eligible, and/or other restrictions, as the Assistant Director may determine.

*Id.* at 110, § XVI.J.

### C. Claims of the Complaint

Karimi's complaint includes three claims. His first claim is for breach of contract, asserting that Defendants breached the terms of the Handbook by placing Karimi on interim suspension before a formal complaint was filed against him, that Niedwiecki breached the covenant of good faith and fair dealing by failing to cooperate with Karimi sufficiently in resolving the issue, that Golden Gate failed to provide classes in accordance with the schedule stated on the syllabus, and that the quality of instruction at Golden Gate did not meet Karimi's expectations. Compl. ¶¶ 25–30. Second, Karimi asserts a claim for defamation based on Niedwiecki's email to the student body regarding Karimi's suspension, which Karimi alleges

15

falsely suggested that he had engaged in threatening behavior and led to friends and classmates cutting off contact with him. *Id.* ¶ 31. Finally, Karimi asserts a claim for intentional infliction of emotional distress, based on Defendants purportedly removing him from school without due process, instructing him not to contact other students or professors, and failing to respond appropriately to the incident where another student cursed at him in class. *Id.* ¶ 32–35.

### D. Parties' Arguments

#### 1. Karimi's Motion

Karimi's present motion seeks a preliminary injunction requiring Golden Gate to refund, with interest, the tuition that he paid, and prohibiting Golden Gate from proceeding with internal disciplinary action against him. Mot. (dkt. 18) at 8. He argues that his case is analogous to *Babcock v. New Orleans Baptist Theological Seminary*, 554 So. 2d 90 (La. Ct. App. 1989), a case where a Louisiana Court of Appeal affirmed a preliminary injunction requiring the defendant seminary to confer a degree on the plaintiff because it had not followed its own procedures in denying him a degree. *Id.* at 8–9.

Karimi contends he is likely to succeed on his breach of contract claim because Golden Gate did not afford him due process as required by both American Bar Association accreditation standards and Golden Gate's own student handbook, because his emails were protected by California Civil Code section 94367(a) and were not actually harassing or aggressive, because Niedwiecki and Golden Gate failed to communicate with him in good faith, and because his alleged conduct was relatively minor in comparison to other cases where universities and colleges imposed similar punishments. Mot. at 9–11. He argues that he is likely to prevail on his defamation claim because Niedwiecki's announcement to Golden Gate students after Karimi spoke with police on campus wrongfully implied that Karimi had been hostile, aggressive, or threatening. *Id.* at 12–13. As for intentional infliction of emotional distress, Karimi contends that the "punishment the dean gave to [him] was extreme in that he was indefinitely kept out of the school without due process or notification of charges," also noting Golden Gate's suggestion that Karimi change seats rather than punishing a student a student who allegedly harassed him. *Id.* at 13. Karimi argues that he feel humiliated an embarrassed, that he and his family have experienced

severe depression and anxiety, and that he and his wife have had trouble sleeping. *Id.*

Karimi contends that Golden Gate's handling of the matter thus far demonstrates "certainty of the school finding him guilty" in its own disciplinary proceeding, and thus that "[i]rreparable harm is certain to come to Karimi in absence of an injunction." *Id.* at 14. He argues that such an outcome would tarnish his record and might prevent him from obtaining admission to a different law school or becoming a lawyer. *Id.* According to Karimi, legal remedies are inadequate because it is impossible to determine how much money he would ultimately make in a career as a lawyer and because "[t]here is no price on obtaining an education," pursuing a desired career path, or the "happiness and pride of achieving the career one desires." *Id.* Karimi also contends that the equities favor an injunction because he faces potential harm as discussed above if an injunction is not granted, while "[v]irtually no harm comes to [Golden Gate] if an injunction is granted" because Karimi now lives in Texas and withholding disciplinary action would not affect the functioning of the school. *Id.*

### 2. Defendants' Opposition

Defendants contend that Karimi cannot show a likelihood of success on any of his claims. Opp'n (dkt. 24) at 12–13. With respect to Karimi's breach of contract claim, Defendants argue that Niedwiecki acted and within his authority under the Handbook's provision for interim suspension, and appropriately in response to complaints from other students. *Id.* at 12; *see also id.* at 3. Contrary to Karimi's interpretation, Defendants contend that the interim suspension provision does not require charges to be filed before a student is suspended. *Id.* at 12. Defendants also argue that Karimi has not shown a likelihood of success on his emotional distress claim because the conduct at issue consisted of "management decisions," and that he cannot prevail on his defamation claim because Niedwiecki's message to the student body did not identify Karimi and was privileged under section 47(c) of the California Civil Code. *Id.* at 12–13 (erroneously citing the California Code of Civil Procedure).

As for irreparable harm, Defendants argue that Karimi's potential harm is merely speculative because, at the time of briefing, the disciplinary process had not yet run its course and Karimi's transcript did not reflect any adverse action. *Id.* at 14. Defendants contend that the

United States District Court
Northern District of California

balance of harms does not favor granting the motion because requiring Karimi to engage in Golden Gate's disciplinary process is not an undue hardship and it would not be feasible to reinstate Karimi for the spring semester when—due to his interim suspension—he did not complete required classes in the fall. *Id.* at 14–15. Defendants argue that the public interest favors denial because Karimi has made no showing as to that factor and Golden Gate's class of first-year law students as a whole would be affected by his return. *Id.* at 15.

### 3. Karimi's Reply

Karimi argues in his reply that Defendants misstate a number of factual issues, including whether Karimi was ever instructed not to email his classmates (as opposed to merely an instruction not to use a specific tool, TWEN, for that purpose). Reply at 4. Karimi also asserts, for example, that Defendants misquoted the Handbook to mischaracterize the relationship between interim suspension and formal charges and to omit the role of the Assistant Director in interim suspensions, and that defense counsel falsely stated that the parties had met and conferred by telephone to discuss alternative dispute resolution.[7] *Id.* at 5–6.

Citing section 94367 of the California Education Code and cases addressing the scope of the First Amendment right to speech in academic settings, Karimi argues that his suspension is unwarranted because his emails to classmates did not constitute "'substantial disruption or material interference with school activities.'" *Id.* at 7–9 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969)). Karimi notes that he did not include a claim under section 94367 of the California Education Code in his complaint because he had not received the charges against him when he filed it, but upon receiving those charges, "it became clear that [Golden Gate] violated" that statute. *Id.* at 9–10. He argues that since he sent his emails to the class from off campus, they fall within the scope of speech protected by that statute. *Id.* at 10. He

---

[7] Golden Gate's attorney Stacey Leask states in a declaration that "[o]n December 15, 2017, the parties met and conferred by telephone to discuss possible ADR options for the case, pursuant to the local rules of court." Leask Decl. (dkt. 28) ¶ 23. An email that Leask sent to Karimi on December 15, 2017 stated that Golden Gate was "of the position that ADR would not be an effective use of resources at [that] time," and went on as follows: "Because I believe that we have sufficiently met and conferred at this stage, I see no reason to proceed with the call at 1:30 pm today. Rather, I suggest that we continue the meet and confer to early January in conjunction with the case management conference that is on calendar for January 19, 2018." Reply Ex. 11.

disputes Defendants' position that his emails were harmful to or targeted at anyone, and that they constituted harassment. *Id.* Karimi also argues that Golden Gate administrators, including Niedwiecki and Yates, have treated him with contempt and condescension. *Id.* at 10–11. Karimi contends that it was "outrageous" for Defendants to "indefinitely punish [him] without charging [him]." *Id.* at 11.

Karimi argues that Niedwiecki's message to the student body was defamatory for suggesting that Karimi posed a safety threat and for indicating that any behavior issues had occurred on campus, when in fact Karimi had sent the emails at issue from off campus. *Id.* at 12. Karimi also argues that he faces irreparable harm because even though there is no formal record of discipline on his transcript, he is required by other schools to disclose any disciplinary action against him and would be lying if he did not disclose the interim suspension and pending proceedings. *Id.* at 12–13. He contends that "[t]he nature of this case coupled with the certainty of expulsion from an internal disciplinary proceeding is also irreparable harm," and that expulsion would limit his ability to obtain admission to another law school. *Id.* at 13. With respect to balancing the equities, Karimi argues that the cases cited by Defendants are inapposite because he does not seek ex parte relief and did not confront staff members, and his behavior at issue was not as disruptive as in one case where a student encouraged classmates to hack into computers. *Id.* at 13–14. In response to Niedwiecki's assertion "that Karimi 'mass emailed' his class," Karimi contends that Niedwiecki also sent mass emails to the student body, some of which—like an email regarding a meeting that included lawyers advocating cannabis legalization—Karimi found offensive. *Id.* at 14.

## III. ANALYSIS

### A. Legal Standard

As an initial matter, the parties appear to dispute whether the Court should look to California law or federal law for the test of whether a preliminary injunction should issue. *See* Mot. at 8 (citing the California Code of Civil Procedure); Opp'n at 11–12 (citing federal court case law). While it is not clear that the outcome would differ under the California standard, federal law applies to this question of procedure. *See Kane v. Chobani, Inc.*, No. 12-cv-02425-LHK, 2013

WL 3776172, at *2–3 (N.D. Cal. July 15, 2013) (applying the tests of *Hana v. Plumer*, 380 U.S. 460, 470 (1965), and *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), and considering the decisions of district courts within the Ninth Circuit); *see also, e.g.*, *Masters v. Avanir Pharm., Inc.*, 996 F. Supp. 2d 872, 878 n.3 (C.D. Cal. 2014); *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 978 n.9 (D. Ariz. 2006).

Under federal law, a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Irreparable harm must be likely— it is no longer sufficient to grant a preliminary injunction upon a mere showing of a "possibility" of irreparable harm when the other factors weigh heavily in favor of the plaintiff. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Nonetheless, the Ninth Circuit still evaluates the likelihood of success on a "sliding scale." *Id.* A preliminary injunction may be warranted upon a showing of "*serious questions* going to the merits" as well as "a hardship balance that tips *sharply* toward the plaintiff," so long as the plaintiff is likely to suffer irreparable harm and the injunction is in the public interest. *Id.* (emphasis added).

## B. Refund of Tuition Payments

The first form of relief that Karimi requests is a refund of his tuition payments. *See* Mot. at 8 ("The relief sought by Karimi in regards to his tuition being refunded takes the form of mandatory relief."). "[P]urely monetary harm measurable in damages" does not constitute irreparable injury to support a preliminary injunction. *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985). Karimi does not discuss his request for a refund in his arguments regarding irreparable harm and the inadequacy of legal remedies. *See* Mot. at 14. Because any harm caused by Karimi's payment of tuition can be compensated through damages, and thus is not irreparable, Karimi's motion for a preliminary injunction requiring Golden Gate to provide a refund is DENIED.

### C. Injunction Against Disciplinary Proceedings

"The second form of relief being sought by Karimi takes the form of prohibitory relief . . . to prevent [Golden Gate] from taking proceedings against him." Mot. at 8.[8] There are two forms of disciplinary proceeding at issue in the case: the formal hearing (or alternative process as may be authorized by the Handbook) that has not yet occurred to resolve Niedwiecki's disciplinary complaint against Karimi, and the interim suspension that Karimi remains subject to pending that resolution. The Court understands Karimi's motion as seeking to enjoin both of those forms of discipline—i.e., vacate the interim suspension and prevent Defendants from moving forward on Niedwiecki's complaint—and thus looks to whether any of Karimi's claims support that relief.

#### 1. Breach of Contract

Karimi contends that Defendants breached their contractual obligations by placing him on interim suspension without following the process required by the Handbook. Specifically, he argues that the phrase "[p]ending action on charges" requires that a disciplinary complaint be filed before an interim suspension is implemented, and that the requirement that at least one of the enumerated grounds for interim suspension be "determined by the Assistant Director and approved by the dean" means the Assistant Director must be involved in the decision. Mot. at 10; Reply at 5–6. Defendants contend that the "pending charges" provision "does not state that charges must be filed . . . prior to the placement on interim suspension." Opp'n at 9, 12. Defendants' opposition brief does not meaningfully address the potential mismatch between Niedwiecki's unilateral action as Dean as compared to the Handbook's process of a determination made by the Assistant Director and ratified by the Dean—an issue first clearly raised in Karimi's reply—but Defendants assert that "it is within the authority of the Dean to place a student on interim suspension 'pending charges.'" *Id.* at 9.

Assuming for the sake of argument that Karimi is correct and the procedures for placing him on interim suspension were defective, Defendants have effectively cured those defects.

---

[8] It is not entirely clear whether Karimi wishes to resume classes at Golden Gate or merely to prevent further disciplinary action so that he can apply to other law schools with a clean record. *See* Compl. ¶ 26 ("Even if [Karimi] could return to school, he had already missed enough classes to put him at too much of a disadvantage to succeed.").

Niedwiecki filed a formal complaint against Karimi that Karimi received on December 1, 2017. Karimi Decl. ¶ 7; Niedwiecki Decl. ¶¶ 51–53; Devoy Decl. ¶¶ 16, 18; Defs.' Exs. O, T; Reply Ex. 23. In his declaration submitted with Defendants' opposition brief, Assistant Director Devoy concurred with Niedwiecki's determination that "interim suspension was appropriate under the circumstances." Devoy Decl. ¶ 32. Accordingly, whatever harm Karimi might have suffered as a result of Defendants' purported failure to file formal charges and obtain Devoy's determination before suspending Karimi does not include Karimi's current suspension, because the procedural conditions that Karimi contends are required by the Handbook have since been satisfied. A preliminary injunction vacating the suspension based on the lack of a formal complaint or Devoy's determination would be an empty formalism; with those conditions now satisfied, Defendants could immediately reinstate the suspension. If past harm from the purportedly defective procedure is redressable, it is redressable through damages, and is not the sort of ongoing or prospective irreparable injury that warrants injunctive relief.

As for the future hearing, Karimi argues that "it is absurd to hold an internal disciplinary hearing at this time after Karimi has sued the school." Mot. at 4. It is not. The contract that Karimi seeks to enforce in this case, i.e., Golden Gate's Handbook, specifically provides for the internal disciplinary hearings and decisions that Karimi seeks to enjoin. Defs.' Ex. A § XVI.F. If, as Karimi contends, the charges against him are not warranted under the Handbook, a disciplinary hearing is one of the procedures that the Handbook provides to make that determination. This is not to say that the Handbook necessarily prevents Karimi from obtaining recourse in court after a final disciplinary decision if some aspect of that decision violates the Handbook—an issue the Court has no occasion to reach on the present motion—but there is no basis to say that moving forward with the process stated in the Handbook would itself constitute a breach of the Handbook. Nor is there any evidence at this time that the panel for a formal hearing, which includes one student and several faculty members, *see* Defs.' Ex. A at 109, § XVI.H.4.b, would be likely to reach an outcome that is both adverse to Karimi and unwarranted under the Handbook. Accordingly, Karimi has not met his burden to show that proceeding with a disciplinary hearing is likely to cause him irreparable harm, that he is likely to succeed on the merits of his claim that the

disciplinary hearing constitutes or would lead to a breach of contract, or that serious questions go to the merits.

### 2. Defamation

In his complaint and his present motion, Karimi bases his defamation claim on the email that Niedwiecki sent to the student body in September of 2017 after Karimi was required to leave campus, which stated that a student (i.e., Karimi) had "in our judgment been experiencing some behavior issues" and had been asked to leave campus, that he had "left the campus on his own accord without resistance," and that while police had been present and Golden Gate had heightened its security procedures, "there was no known safety concern." *See* Compl. ¶ 31; Mot. at 12–13; Reply at 12 & Ex. 10. Karimi has not explained any connection between the injunctive relief that he seeks—barring Defendants from continuing with disciplinary proceedings—and the reputational harm that he suffered as a result of Niedwiecki's purportedly defamatory statement in September. The Court concludes that Karimi has not met his burden to show a likelihood of irreparable harm due to defamation redressable by the proposed injunction.

### 3. Intentional Infliction of Emotional Distress

The final claim of Karimi's complaint, for intentional infliction of emotional distress, fails to support his requested injunction for much the same reason as his contract claim. Even assuming for the sake of argument that Karimi could prevail on this claim based on Defendants' past conduct such as purportedly failing initially to follow the correct procedure for imposing an interim suspension, giving Karimi conflicting instructions about how to communicate with Golden Gate, and communicating with Karimi in a contemptuous or condescending manner, Karimi has not explained how such conduct relates to a likelihood of "irreparable harm in the absence of [the] preliminary relief" that he seeks, i.e., and injunction against further disciplinary proceedings. *See Winter*, 555 U.S. at 20. Looking to the actual conduct that Karimi seeks to enjoin—his continued interim suspension and future disciplinary hearing—Karimi is not likely to prevail on a claim that the disciplinary procedures specifically called for the in Handbook, including the adjudicative procedure of a hearing, themselves constitute conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (2009)

23

(setting forth the elements of a claim for intentional infliction of emotional distress under California law).

### 4. Education Code Section 94367

One of Karimi's primary arguments is that Defendants punished him for protected speech and thus violated section 94367(a) of the California Education Code, which reads as follows:

> No private postsecondary educational institution shall make or enforce a rule subjecting a student to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside the campus or facility of a private postsecondary institution, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution.

Cal. Educ. Code § 94367(a); *see* Mot. at 1–2; Reply at 9–10, 14. Subsection (b) of that statute provides that a student subject to such a rule or enforcement "may commence a civil action to obtain appropriate injunctive and declaratory relief as determined by the court." Cal. Educ. Code § 94367(b).

The Supreme Court has described the remedy of a preliminary injunction as "appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945). "This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Based on that principle, courts have held that a plaintiff may not obtain a preliminary injunction based on a claim not asserted in the operative complaint. *E.g.*, *Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997) ("Here, the suit is one for damages on a claim of fraud. In his injunction Kaimowitz sought equitable relief regarding a First Amendment issue, but that relief was not of the same character that could be granted finally, and dealt with a matter that was wholly outside of the issues in the suit."); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994); *Varnell v. Wash. Dep't of Corr.*, 2017 WL 378571, at *1 (W.D. Wash. Jan. 24, 2017) (denying a request for injunctive relief under the Americans with Disabilities Act as "beyond the scope of the operative complaint," which asserted an Eighth Amendment violation), *aff'd sub nom. Varnell v. Sawyer*, 692 F. App'x 906 (9th Cir. 2017); *England v. Foster*, No. 3:13-CV-

00188-RCJ-VP, 2015 WL 51181, at *2 (D. Nev. Jan. 2, 2015) *Johnson v. Dep't of Corr.*, No. C08-5426BHS, 2009 WL 528957, at *2 (W.D. Wash. Feb. 27, 2009).

Karimi's complaint does not assert a claim under section 94367, otherwise reference that statute, or even generally allege that Defendants violated Karimi's right to free speech under either the United States Constitution or the California Constitution. *See generally* Compl. In his prayer for relief, Karimi seeks only monetary damages. *See id.* at 10–11, ¶¶ a–e.[9] The complaint defines the scope of the case, and a favorable judgment on the claims asserted in Karimi's present complaint would not entitle him to injunctive relief based on section 94367. Karimi argues that he was not aware of the basis for a claim under that statute when he filed his complaint, but his recourse under such circumstances is to amend his complaint. If Karimi wishes to assert a claim under section 94367, he may file an amended complaint no later than May 14, 2018.[10]

## IV. CONCLUSION

For the reasons discussed above, Karimi has not met his burden to justify the "extraordinary remedy" of a preliminary injunction. *See Winter*, 555 U.S. at 22. The motion is DENIED.

**IT IS SO ORDERED.**

Dated: April 23, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[9] The Court need not address whether Karimi's failure to include injunctive relief in his prayer prevents him from obtaining a preliminary injunction based on the claims that he actually asserted, because, as discussed separately, none of those claims provide a basis for a preliminary injunction on the current record, even assuming for the sake of argument that such relief is within the scope of the complaint.

[10] If further motions practice addressing section 94367 becomes necessary at a later stage of the case, the parties are instructed to address in more detail whether the statute only applies to off-campus speech (as both parties appear to assume, but is not obvious from the statutory language), and if so, whether emails sent from an off-campus location solely to members of the campus community constitute "off-campus" speech for the purpose of the statute.