UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MORTEZA BENJAMIN RAY KARIMI,

Plaintiff,

v.

GOLDEN GATE SCHOOL OF LAW, et al.,

Defendants.

Case No. 17-cv-05702-JCS

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND MOTION FOR SANCTIONS**

Re: Dkt. Nos. 90, 91

## I.  INTRODUCTION

Plaintiff Morteza Benjamin Ray Karimi brought this action against Defendant Golden Gate School of Law ("Golden Gate") and its dean, Defendant Anthony Niedwiecki, based on disciplinary action taken against Karimi, including an indefinite interim suspension.  The Court previously denied Karimi's motion for a preliminary injunction.  Karimi thereafter withdrew from Golden Gate and enrolled in a different law school.  Defendants now move for summary judgment, as well as sanctions against Karimi for failing to appear at his deposition.  The Court found the matter suitable for resolution without oral argument and vacated the hearing on Defendants' motions.  For the reasons discussed below, Defendants' motions are GRANTED.  The Court excludes Karimi's own declarations and testimony under Rule 37 of the Federal Rules of Civil Procedure, and Defendants are entitled to summary judgment on all claims.[1]

## II.  BACKGROUND

### A.  Karimi's First Amended Complaint

Karimi enrolled at Golden Gate in the summer of 2017.  1st Am. Compl. ("FAC," dkt. 58) at 3.  He alleges that Golden Gate did not respond appropriately when another student cursed at

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

him in his torts class, and when that student later joined a conversation uninvited in the library and repeatedly interrupted Karimi, despite Karimi calling the San Francisco Police Department to report the incident.  *Id.* at 4.

Karimi alleges that he first emailed his classmates after his torts professor canceled class before the Labor Day holiday weekend at the request of some students, and after neither the professor nor the Associate Dean of Law Student Support was receptive to Karimi's concern that class should not have been canceled.  *Id.* at 5.  After Karimi emailed his classmates, he alleges that he was asked to speak with Niedwiecki and Assistant Dean Mark Yates, at which time Niedwiecki instructed Karimi not to use a particular communications platform known as TWEN to email his classmates, and Karimi complied with that instruction.  *Id.*

Karimi alleges that he later complained to Golden Gate about professors allowing students to speak about student organizations and student government elections during class time.  *Id.* When Golden Gate did not intervene, Karimi alleges that he emailed his classmates to state his objections.  *Id.*  Karimi alleges that some students replied to the whole class, calling Karimi a "coward" and a "bully."  *Id.* at 5–6.

Karimi alleges that he emailed Niedwiecki on September 14, 2017 about a professor who Karimi believed was not calling on him or allowing him to speak in class as much as other students.  *Id.* at 6.  Karimi alleges that Niedwiecki emailed him later the same day informing him that he was suspended indefinitely, but that Karimi did not read the email before going to class the next day, where a Golden Gate security officer told him to come to a private room and gave him a copy of the suspension email.  *Id.*  Karimi alleges that he called the police, who arrived and informed him that he would be trespassing if he returned to campus.  *Id.* at 6–7.  According to Karimi, Niedwiecki then emailed the Golden Gate community regarding "security concerns" related to Karimi's "behavioral issues," and noting that security would be increased.  *Id.* at 7.

Karimi alleges that Niedwiecki later sent him an email presenting the options of withdrawal from Golden Gate or formal disciplinary procedures, and that other representatives of Golden Gate pressured him to withdraw in exchange for a refund of tuition and other expenses, but he declined to do so.  *Id.* at 7–8.  According to Karimi, Golden Gate's counsel sent him a

disciplinary complaint prepared by Niedwiecki alleging infractions based on Karimi's emails to his classmates, and later a "Disciplinary Action Letter." *Id.* at 7–8. Karimi alleges that after Golden Gate professor and administrator Dan Devoy told Karimi he would like to engage in an "informal resolution process," Karimi filed his motion for a preliminary injunction in this action, and Golden Gate agreed to postpone its internal disciplinary process. *Id.* at 9.

Karimi alleges that Niedwiecki "kicked [Karimi] out of school for emails that [Karimi] had sent regarding how class time was being spent." *Id.* at 2. According to Karimi, his emails to classmates regarding the use of class time were polite, did not single out particular students, and were intended to improve the quality of his education. *Id.* at 3. Karimi alleges that he was humiliated by the suspension and that it violated Golden Gate's procedures. *Id.* at 2–3.

Karimi asserts six claims. First, Karimi contends that Defendants violated section 94367 of the California Education Code, also known as the "Leonard Law," by imposing disciplinary sanctions for speech protected by the United States Constitution and California Constitution if made off campus, and by restricting Karimi's association with members of the Golden Gate community. *Id.* at 9–10.

Second, Karimi asserts that Defendants breached their contractual obligations under the Golden Gate student handbook by: (1) Niedwiecki imposing interim suspension before disciplinary charges were pending against Karimi; (2) Niedwiecki imposing interim suspension unilaterally rather than approving suspension imposed by the Assistant Director for Student Conduct and Professionalism ("Assistant Director"); (3) failing to provide Karimi due process; (4) suspending Karimi when he did not violate Golden Gate policies; (5) canceling the torts class before Labor Day weekend; (6) allowing students to promote their organizations and candidacies during class time; and (7) not having an Assistant Director in place to oversee Karimi's disciplinary process from the beginning. *Id.* at 10–12.

Third, Karimi asserts that Defendants breached their duty of good faith and fair dealing by imposing disciplinary measures against Karimi but not against the student who harassed him in class, suspending Karimi without notice or formal charges, keeping his fall tuition while he was suspended, failing to comply with certain provisions of the student handbook, and pressuring

Karimi to withdraw. *Id.* at 13–15.

Fourth, Karimi asserts a claim for "Defamation/False Flight" (sic) based on Niedwiecki's email to the Golden Gate community. *Id.* at 15–17. Karimi alleges that the email falsely stated he was "requested" to leave for an "indefinite period" when Niedwiecki in fact ordered him to leave and that Karimi exhibited "behavioral issues at the University" when his suspension was in fact based on emails sent from off campus, and generally gave the impression that Karimi was dangerous, all of which damaged Karimi's reputation and caused him to lose friends. *Id.*

Karimi's fifth claim is for invasion of privacy by public disclosure of private facts. *Id.* at 17–18. Karimi asserts that Niedwiecki's email to the Golden Gate community violated the Family Educational Rights and Privacy Act ("FERPA") by disclosing "personal identifying information" and "educational records." *Id.*

Karimi's sixth and final claim is for intentional infliction of emotional distress, based both on the incident where another student cursed at him and on his later suspension. *Id.* at 18–20. Karimi asserts that Golden Gate's failure to investigate or take action beyond reassigning seats regarding the alleged harassment, which Karimi characterizes as "reckless negligence" by Golden Gate, "totally disregarded [his] emotional state as well as physical safety" and left him scared and humiliated. *Id.* at 19. Karimi alleges that his suspension was an abuse of power by Niedwiecki that disregarded Karimi's personal circumstances, including his desire to practice law and his need to provide for his family. *Id.* at 19–20.

Karimi seeks damages in excess of $200,000, including for violation of his civil rights under section 94367 and for delaying his ability to work as a lawyer for at least a year, among other categories of damages. *Id.* at 20–21. Karimi also seeks declaratory relief under section 94367, and—at the time he filed his amended complaint—sought injunctive relief of reinstatement in the event that he was not admitted to another law school. *Id.* at 20.

**B.    Evidence Submitted by Karimi**

To ensure that Karimi's evidence is given sufficient consideration where the analysis below assumes for the sake of argument that it would not be excluded, this section summarizes the evidence submitted by Karimi in opposition to Defendants' motions. Evidence submitted by

Defendants is discussed in context where relevant to the Court's analysis. The Court's previous order denying Karimi's motion for a preliminary injunction provides a more detailed review of the factual background of the case. *See* Order Denying Mot. for Prelim. Inj. (dkt. 57) at 1–15.[2]

### 1. Karimi's Declaration Opposing Summary Judgment

The evidence that Karimi has filed opposing summary judgment is relatively sparse. Karimi states that he was a student at Golden Gate in September of 2017. Karimi MSJ Decl. (dkt. 92-1) ¶ 1. Early in the year, he was harassed by another student and called the San Francisco Police Department to file a report. *Id.* ¶ 15. He waited about four hours for police to arrive but eventually went home when the police department was unable to provide an estimate for when officers would arrive. *Id.* Karimi was fearful at Golden Gate and considered the environment on campus to be hostile. *Id.* ¶ 16. According to Karimi, "[s]tudents had sent [him] hostile emails and would make fun of [him] in class and about campus." *Id.* He had only one friend and generally did not speak or socialize with other Golden Gate students, instead spending his time on campus in class, where he would ask questions, or studying in the library. *Id.* ¶¶ 16–17.

Karimi expressed concern when a torts class was canceled. *Id.* ¶ 2. He characterizes his efforts to communicate that concern as "civil," and states that he "was never enraged by the cancellation." *Id.*

Karimi sent emails to his classmates about the canceled class and other issues, including Karimi's disapproval of students using class time to discuss student groups (including "ethnocentric groups"), personal stories, and candidacies for student government. *See id.* Exs. 3, 4. Several of Karimi's classmates responded negatively to those emails. *See id.* Ex. 4. Karimi states that when classmates asked him not to email them, he attempted to remove them from future emails, although in one case he accidentally emailed someone again who used multiple email addresses. *Id.* ¶ 6.

According to Karimi, Niedwiecki instructed him not to use the TWEN system to contact

---

[2] *Karimi v. Golden Gate Sch. of Law*, No. 17-cv-05702-JCS, 2018 WL 1911804 (N.D. Cal. Apr. 23, 2018)

students, and he did not do so. *Id.* ¶ 3. Hours before Karimi was suspended on September 14, 2017, Niedwiecki sent him an email instructing him not to use TWEN or any other method of emailing his class. *Id.* ¶ 4. Karimi did not email his classmates again after he read that email from Niedwiecki. *Id.* ¶ 5.

Later the same day, Niedwiecki emailed Karimi again to inform him that he was suspended, but Karimi did not read that email before going to campus the next day. *Id.* ¶¶ 8–9. When Karimi arrived at the library, Associate Dean Jessica Bride made eye contact with him but did not speak to him. *Id.* ¶ 10. Golden Gate's Director of Business Services and Facilities Mike Koperski (whose responsibilities include security), along with "another plain clothes security guard," confronted Karimi when he was leaving the library and escorted him to a private room, where Koperski gave Karimi a copy of Niedwiecki's email regarding Karimi's suspension. *Id.* ¶¶ 11–12. In the email, Niedwiecki stated that he was the "final decision maker" regarding Karimi's suspension, which Karimi characterizes as a denial of due process under the Golden Gate student handbook. *Id.* ¶ 18 & Ex. 5. After Koperski told Karimi that he could not speak to Niedwiecki, Karimi "demanded that police be called" and left the building to wait outside for the police. *Id.* ¶ 12. Karimi states that Koperski never instructed him to leave campus. *Id.* About fifteen minutes later, police officers arrived and, after Karimi explained the situation, told him that he would be trespassing if he returned to Golden Gate while suspended. *Id.* ¶ 13.

After Karimi was suspended, he "did not email students who told [him] they did not want to email." *Id.* ¶ 7. He "attempted to contact [Niedwiecki] and [Golden Gate] to get back in and be given due process," and when he determined that those efforts were futile, "attempted to negotiate a settlement." *Id.* ¶ 23.

In the summer of 2018—while this lawsuit was pending—Karimi was accepted to another law school in Houston, Texas, and informed the Court and defense counsel of that fact. *Id.* ¶ 20. Defense counsel nevertheless attempted to schedule Karimi's deposition in Austin, Texas, and on days when Karimi had class or during his midterms. *Id.* ¶¶ 21–22.

### 2. Karimi's Declaration Opposing Sanctions

Karimi's declaration in response to Defendants' motion for sanctions reads, in full, as

6

follows:

> 1. I have been living in Houston, Texas since August 10, 2018
>
> 2. I matriculated to his [sic] new law school in late August of 2018.
>
> 3. For the Fall semester, I have classes everyday of the week. I have 4 classes on Monday, starting from 8:00 a.m. with the last class ending at 4:50 p.m. On Thursdays I have 1 class from 11-11:50. On Fridays I have 3 classes, starting from 8:00 a.m. with the last class ending at 4:50 p.m.
>
> 4. My mid-term exams throughout the month of November. [sic]
>
> 5. Defendants [sic] scheduling and timing of the interfiered [sic] with my law school schedule and studies. The added annoyance and stress from Defendant's inconvenient scheduling distracted me from my studies.

Karimi Decl. Re Sanctions (dkt. 93-1).

## C. The Parties' Arguments

### 1. Briefing Regarding Defendants' Motion for Sanctions

Defendants seek sanctions against Karimi for adding claims other than under section 94367 in his amended complaint, which Defendants characterize as a violation of the Court's order permitted Karimi leave to amend, and for Karimi's failure to appear at his deposition. *See generally* Sanctions Mot. (dkt. 90). Defendants contend that they made repeated efforts to schedule a deposition convenient for Karimi, including rescheduling the deposition to avoid Karimi's midterms, but that Karimi nevertheless failed to appear or cooperate with Defendants' efforts to take his deposition, instead insisting that a written deposition would be sufficient. *Id.* at 3–5. Defendants argue that a sanction of dismissal is appropriate under Rule 37 of the Federal Rules of Civil Procedure where a party willfully fails to appear for his own deposition, and that a sanction of excluding Karimi's evidence as to several claims is appropriate here. *Id.* at 4–6. Defendants contend that no alternative sanctions are available because discovery has closed and Karimi, who is indigent, would be unable to pay an award of attorneys' fees or other monetary sanctions. *Id.* at 6–7. Defendants also seek to strike Karimi's third, fourth, and fifth claims as purportedly added without leave of the Court. *Id.* at 6.

Karimi argues that Defendants initially noticed a deposition to occur in Austin, Texas

despite knowing that Karimi had relocated to Houston, Texas, and that by waiting until near the end of the discovery period, Defendants "attempted to schedule the deposition at an extremely inconvenient time and place to annoy and inconvenience" him. Opp'n to Sanctions (dkt. 93) at 1–2. Karimi also argues that Defendants failed to comply with Civil Local Rule 7-8(c), which requires a party to file a motion for sanctions as soon as practicable after learning of the circumstances giving rise to the motion, because Defendants waited more than a month after Karimi failed to appear for his deposition to bring their motion. *Id.* at 2–3. Karimi asserts that he "never had an objection to a deposition and in fact stated that he would be willing to also give a written deposition." *Id.* at 3.

Defendants argue in their reply brief that they attempted to work around Karimi's schedule and that Karimi has not refuted their showing that a deposition was necessary and that Karimi intentionally failed to appear. *See generally* Reply Re Sanctions (dkt. 94). Defendants do not address Karimi's argument that the sanctions motion was untimely.

### 2. Briefing Regarding Motion for Summary Judgment

#### a. Defendants' Motion

Defendants seek summary judgment on all of Karimi's claims. *See generally* Defs.' Mot. for Summ. J. ("MSJ," dkt. 91). Defendants contend that Karimi cannot prevail under section 94367 of the California Education Code because that statute only authorizes a private action for injunctive and declaratory relief, and any claim for such relief is moot now that Karimi has withdrawn from Golden Gate without any notation of discipline on his record and enrolled at a different law school, and does not intend to return to Golden Gate. *Id.* at 8–10. Defendants also note that Karimi cannot recover attorneys' fees because he has represented himself throughout this litigation. *Id.* at 10.

Defendants also argue that Karimi's withdrawal from Golden Gate is fatal to his breach of contract and duty of good faith and fair dealing claims because such claims would require Karimi to exhaust internal administrative remedies, and Karimi has not done so and cannot do so now that he is no longer a student at Golden Gate. *Id.* at 10–11. Defendants also assert that if Karimi "cannot establish a breach of contract, he has no claim for breach of implied covenant arising from

8

a contract." *Id.* at 11 (citing *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 629–30 (1995)).

Defendants contend that they are entitled to summary judgment on Karimi's claim for defamation and false light, arguing that Niedwiecki's email to the Golden Gate community did not identify Karimi by name, and that even if anyone had concluded that the unnamed student addressed in the email was Karimi, the email was not defamatory because the facts stated in the email were true. *Id.* at 11–12. Defendants further argue that Niedwiecki's email falls within the qualified privilege provided by California Civil Code section 47(c) for communications to interested persons because other members of the Golden Gate community had an interest in understanding why police had been on campus. *Id.* at 12. Defendants assert that a false light claim brought in conjunction with a defamation claim "'stands or falls on whether it meets the same requirements as the defamation cause of action.'" *Id.* at 13 (quoting *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1264 (2017)).

With respect to Karimi's claim for public disclosure of private facts, Defendants contend that Niedwiecki's email did not disclose intimate details of Karimi's life. *Id.* at 13–14. To the contrary, Defendants argue that the email discussed only matters that were already in the public domain, as it described conduct that occurred on campus where others were present. *Id.* Defendants also argue that Niedwiecki did not disclose educational records protected by FERPA. *Id.* at 14.

Defendants argue that Karimi cannot prevail on a claim for intentional infliction of emotional distress because their conduct was not "outrageous" as required for such a claim under California law. *Id.* at 14–15.

Finally, Defendants contend that they are entitled to summary judgment if the Court grants their motion for evidentiary sanctions because under such circumstances Karimi would be unable to establish elements of his claims, including damages. *Id.* at 15–16.

> b. Karimi's Opposition

Karimi takes issue with Defendants' characterization of certain facts and objects based on

the hearsay rule to declarations stating what other students told Golden Gate employees.[3] Opp'n to MSJ (dkt. 92) at 1–8.

Karimi argues that his claim under section 94367 is not moot because "he may attend another law school in California sometime in the future." *Id.* at 8. He contends that declaratory relief is also appropriate in light of the dearth of authority interpreting that law and the public interest in deterring other universities from violating the statute in the future. *Id.* Karimi also argues that Defendants waived their mootness defense by failing to assert it as an affirmative defense in their answer. *Id.* at 8–9.

With respect to his breach of contract and implied covenant claims, Karimi argues that Defendants did not provide him any opportunity pursue internal procedures until Niedwiecki filed a formal disciplinary complaint near the end of the first semester, at which point Karimi would have already in effect missed a year of school because the first-semester classes for first-year students are not offered in the spring. *Id.* at 9. Karimi also contends that Defendants violated their internal procedures when Niedwiecki, rather than the "Assistant Director" referenced in the student handbook, placed Karimi on interim suspension before a formal complaint had been filed. *Id.* at 9–10. Karimi contends that the Assistant Director position was vacant when Niedwiecki suspended him. *Id.* Karimi also argues the cases on which Defendants rely for requiring exhaustion of internal university procedures do not apply here because they concerned public rather than private universities, and employee rather than student plaintiffs. *Id.* at 10.

Karimi asserts, inaccurately, that Defendants' motion does not dispute that Niedwiecki's email was defamatory and instead relies only on a defense of qualified privilege. *Id.* at 10–11; *cf.* MSJ at 12 (asserting that "the defamation claim fails because there is no false statement"). Karimi contends that Niedwiecki's email was inaccurate in referring to behavioral issues on campus when the behavior at issue was Karimi sending emails from off campus, and that Niedwiecki's email falsely implied that Karimi was dangerous. Opp'n to MSJ at 11. Karimi also argues that he need not have been named in the email if members of the Golden Gate community understood that it

---

[3] While many of those statements would likely be admissible for purposes other than the truth of the matter asserted, this order does not rely on any such statements.

referred to him, although he cites no evidence that anyone had such an understanding. *Id.* at 11–12. Karimi contends that the qualified privilege does not apply because Defendants have "not shown any interest in the GGU's [sic] knowledge of the Dean's false statements regarding [Karimi]," and that members of the community could not have had such an interest because the statements were false. *Id.* at 12. Karimi argues that Niedwiecki had actual malice in sending the email, because Niedwiecki knew his statements were false or recklessly disregarded the possibility that they might be, and because Niedwiecki intended to discredit Karimi's "complaint regarding [Golden Gate's] low bar passage rates and history of being put on probation by the ABA." *Id.* at 12–13.

Karimi argues that his claim for public disclosure of private information should proceed because FERPA restricts the disclosure of disciplinary records, and Niedwiecki's email effectively disclosed that Karimi had been suspended. *Id.* at 13–14. Karimi contends that the events described in the email were not within the public domain because his claim is "based on [Niedwiecki's] defamatory email, not events that took place in the library," and because his "interaction with police [was] off campus, outside of any building, and on a public sidewalk." *Id.* at 14. According to Karimi, the statement in Niedwiecki's email that Karimi left campus after police arrived was false, because Karimi had already left campus and was on the public sidewalk when police arrived. *Id.*

Finally, with respect to his claim for intentional infliction of emotional distress, Karimi contends that Niedwiecki's conduct—purportedly suspending him in violation of student handbook procedure—is more extreme than mere insults, and that a jury should decide whether it is sufficiently outrageous to support a claim. *Id.* at 14–15.

### c. Defendants' Reply

Defendants argue again in their reply brief that Karimi's claim under section 94367 is moot because Karimi has ended his relationship with Golden Gate, and contend that the possibility Karimi might return to California does not create a controversy with Defendants that could be resolved through injunctive or declaratory relief. Reply re MSJ (dkt. 95) at 2–3. Defendants argue that, because mootness naturally arises during the course of a case and arose here after the

pleadings closed, they were not required to plead an affirmative defense of mootness in their answer. *Id.* at 3.

Defendants argue that they are entitled to summary judgment on Karimi's breach of contract and good faith and fair dealing claims because exhaustion of internal remedies is required in California as a matter of public policy, even in student misconduct cases at private universities. *Id.* at 4 (citing, *e.g.*, *Gupta v. Stanford Univ.*, 124 Cal. App. 4th 407, 411 (2004)). With respect to Karimi's defamation and false light claims, Defendants contend that there is no evidence that Niedwiecki's email was false, that anyone understood it as referring to Karimi, or that Niedwiecki acted out of malice towards Karimi. *Id.* at 5. Defendants renew their arguments that Karimi's public disclosure claim fails because Niedwiecki did not disclose intimate details of Karimi's life, and that Defendants did not engage in "outrageous" conduct sufficient under California law to support a claim for intentional infliction of emotional distress. *Id.* at 5–6.

Defendants also renew their argument that they should be granted summary judgment as to several of Karimi's claims if the Court issues discovery sanctions precluding evidence or striking claims. *Id.* at 1–2.

## III.    ANALYSIS

### A.    Motion for Sanctions

A party who fails to appear at his own deposition may be subject to sanctions under Rule 37(d) of the Federal Rules of Civil Procedure. Failure to appear "is not excused on the ground that the discovery sought was objectionable." Fed. R. Civ. P. 37(d)(2). With the exception of contempt, a district court may impose the same sanctions available for failure to comply with a discovery order:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;

United States District Court
Northern District of California

(v) dismissing the action or proceeding in whole or in part; [or]

(vi) rendering a default judgment against the disobedient party[.]

Fed. R. Civ. P. 37(b)(2)(A); *see also* Fed. R. Civ. P. 37(d)(3) (incorporating that list of sanctions as applicable for failure to appear at a deposition).

The Ninth Circuit looks to the following factors in considering whether a case-dispositive sanction is appropriate:

> "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003)).  Because the first, second, and fourth factors carry relatively static weight with little variance based on the facts of a particular case, "'the key factors are prejudice and the availability of lesser sanctions.'"  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993) (quoting *Wanderer v. Johnston*, 910 F.3d 652, 656 (9th Cir. 1990)).  The "availability of lesser sanctions" factor includes "whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions."  *Conn. Gen. Life Ins.*, 482 F.3d at 1096.

Routine schedule conflicts within a party's control are not a sufficient reason for failing to appear for a deposition.  *See Henry*, 983 F.2d at 949 (rejecting a party's excuse that he was unable to negotiate "a formal retainer agreement with counsel after her law firm disbanded, and the fact that he was out of town on business").  Defendants asked Karimi when he would be available for a deposition.  In response, Karimi could have proposed a time for his deposition that did not conflict with his class schedule.  He did not.  *See* Leask Decl. ¶¶ 21–33; Defs.' Exs. RR–CCC.[4]  Alternatively, Karimi could have asked his professor for permission to miss a class to allow for the deposition.  There is no indication that he did so.  Defendants repeatedly offered to adjust, and in fact adjusted, the time and location of Karimi's deposition in an effort to accommodate his

---

[4] Defendants submit a consolidated set of exhibits as docket entry 91-7.

location and schedule, including an offer to take the deposition by telephone without requiring Karimi to appear at any particular location. *See* Defs.' Exs. UU, WW, XX, ZZ. Karimi's only engagement with those offers was to insist that written questions should substitute for an oral deposition. Defs.' Exs. TT, VV, BBB. Finally, while there is no reason to believe such a motion would have been successful, Karimi could have sought a protective order from the Court barring the deposition, but made no effort to do so.

In disputing Defendants' characterization of the parties' discussions, Karimi misrepresents the record. Karimi states, for example, that Defendants' assertion that they "requested [his] address is false," and that "[t]here is no record that proves this." Opp'n to Sanctions at 2. Defense counsel Stacey Leask's October 10, 2018 email to Karimi includes the following: "Please provide me with your current residence address in Houston or if not Houston, where you presently reside." Defs.' Ex. RR. Karimi asserts that he "never had an objection to a disposition [sic] and in fact stated that he would be willing to also give a written disposition [sic]." Opp'n to Sanctions at 3. The record makes clear that Karimi was not "also" willing to submit to a written deposition, but instead insisted that a written deposition should substitute for an oral deposition. *See* Defs.' Exs. TT, VV, BBB. Karimi's assertion that Defendants "attempted to schedule the deposition at an extremely inconvenient time and place to annoy and inconvenience [him]," Opp'n to Sanctions at 2, is also unsupported by the record, which indicates that defense counsel inquired as to Karimi's scheduling conflicts, Defs.' Ex. RR, asked Karimi to propose an alternative date after Karimi objected to the date originally noticed, Defs.' Ex. UU, changed the date after Karimi failed to propose an alternative date, Defs.' Ex. WW, offered to take the deposition by telephone to allow Karimi to choose the location from which he would participate, *id.*, and changed the location after Karimi confirmed that he no longer resided in the vicinity of Austin, Defs.' Ex. ZZ. Given the time constraints imposed by the discovery cutoff date, it is difficult to see how Defendants could have been more accommodating of Karimi's objections without forsaking entirely the deposition to which they were entitled.

Litigating a civil case requires significant efforts by both parties. Karimi's failure to take discovery to support his own case was a decision he was entitled to make, albeit one with

14

consequences for his likelihood of success. His failure to cooperate with Defendants' legitimate efforts to obtain discovery from him, however, significantly prejudiced Defendants' ability to defend against the claims Karimi brought against them. This is particularly true with respect to claims that would depend on Karimi's subjective testimony, such as claims involving emotional distress. A deposition provides an important and unique opportunity for a party to test its opponent's testimony before trial, potentially revealing contradictions, qualifications, or admissions that undermine the opponent's position. Karimi's failure to appear for his deposition deprived Defendants of that opportunity. The prejudice to Defendants weighs heavily in favor of meaningful sanctions.

Karimi does not suggest any viable alternative sanctions in his opposition brief. Defendants argue persuasively that attorneys' fees or other monetary sanctions are not viable alternative because Karimi is indigent. Even if the Court extended the discovery period and ordered Karimi to submit to a deposition, Defendants would be prejudiced by their increased attorneys' fees, extended litigation, and the likely need to re-brief their summary judgment motion after a belated deposition. The Court is aware of no sanction—short of the evidence preclusion ordered here—that would effectively compensate Defendants for that prejudice. And although the Court did not explicitly warn Karimi of potentially dispositive sanctions, at the case management conference the Court explicitly approved the deposition that Karimi failed to appear for, and Defendants warned Karimi via email that they would seek dipositive or monetary sanctions if he failed to appear. *See* Defs.' Ex. XX. The Court also notes that, as a law student, Karimi had resources available to research his discovery obligations, the avenues available to seek relief from those obligations, and the potential sanctions for failure to comply. The Court concludes that Karimi had sufficient actual and constructive notice of his obligations and that no lesser sanction than that imposed here would be effective. Moreover, although Karimi is correct that this Court's local rules require a motion for sanctions to be filed as soon as practicable, *see* Civ. L.R. 7-8(c), Defendants filed their motion within a matter of weeks after Karimi failed to appear for his deposition, and Karimi has not identified any prejudice stemming from that relatively short delay, or any alternative sanctions that would have been available if Defendants had filed their motion

15

earlier.

In crafting a narrow sanction, the Court need not dismiss outright any claim. Instead, the Court prohibits Karimi "from introducing designated matters in evidence" pursuant to Rule 37(b)(2)(A)(ii)—specifically, his own declarations and testimony, which Defendants were unable to test through a deposition. As discussed below, that sanction is effectively dispositive of Karimi's claim for intentional infliction of emotional distress. The Court concludes for the reasons discussed above that this limited dispositive effect is justified under the test described in *Connecticut General Life Insurance* and similar Ninth Circuit authority. While this sanction might also prevent Karimi from prevailing on other claims, its practical effect is fairly narrow, as the analysis below explains that Defendants would be entitled to summary judgment on many of Karimi's claims even without this sanction.

Much of the analysis below assumes for the sake of argument that Karimi's declarations could be considered. The Court discusses the effect of precluding those declarations in detail only where relevant to the outcome of the motion.[5]

### B. Legal Standard for Summary Judgment Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.*

---

[5] Defendants also cite as a basis for sanctions Karimi's inclusion of additional claims in his amended complaint beyond that which the Court granted leave to add. If Defendants objected to Karimi's amended complaint, they could have filed an appropriate motion after Karimi filed it in May of 2018. Taking into account the liberal policy of amendment underlying the Federal Rules of Civil Procedure, the Court would very likely have granted Karimi leave to add additional claims to his complaint if he had sought such leave at the time. Defendants' belated objection to Karimi's amendment is not a sufficient reason to impose sanctions.

1  (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

2  disputed must support the assertion by . . . citing to particular parts of materials in the record

3  . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

4  substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v.*

5  *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of

6  identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan*

7  *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court to scour the

8  record in search of a genuine issue of triable fact. *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237

9  F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

10      A party need not present evidence to support or oppose a motion for summary judgment in

11  a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

12  to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

13  2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

14  are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co.,*

15  *Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all

16  reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

17  (2007), but where a rational trier of fact could not find for the non-moving party based on the

18  record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

19  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

20  **C.   California Education Code Section 94367**

21      Karimi's first claim invokes California's Leonard Law, which provides as follows:

22          No private postsecondary educational institution shall make or
23          enforce a rule subjecting a student to disciplinary sanctions solely on
            the basis of conduct that is speech or other communication that, when
            engaged in outside the campus or facility of a private postsecondary
24          institution, is protected from governmental restriction by the First
            Amendment to the United States Constitution or Section 2 of Article
25          I of the California Constitution.

26  Cal. Educ. Code § 94367(a). The statute provides only for declaratory relief, injunctive relief, and

27  attorneys' fees, *id.* § 94367(b), and Karimi does not dispute Defendants' position that it does not

28  authorize damages. Defendants argue that because Karimi no longer attends Golden Gate and

does not seek to return, his claim for injunctive relief under section 94367 is moot.

"A federal court does not have jurisdiction 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997) (quoting *Church of Scientology v. United States,* 506 U.S. 9, 12 (1992)). "At any stage of the proceeding a case becomes moot when 'it no longer present[s] a case or controversy under Article III, § 2 of the Constitution.'" *Abdala v. I.N.S.*, 488 F.3d 1061, 1063 (9th Cir. 2007) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). "If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed." *Am. Rivers*, 126 F.3d at 1123. "The central question of the mootness analysis is whether a change in circumstances since the initiation of the claim or motion has rendered meaningless any relief the court would otherwise grant." *Gerke v. Travelers Cas. Ins. Co. of Am.*, No. 3:10-CV-01035-AC, 2013 WL 6241983, at *5 (D. Or. Dec. 3, 2013) (citing *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 926 n.4 (9th Cir. 2000)).

Karimi no longer seeks reinstatement or relief from disciplinary proceedings at Golden Gate. *See* Opp'n to MSJ at 8 (arguing only that Karimi "may attend *another* law school in California sometime in the future" (emphasis added)). In light of Karimi having permanently withdrawn from Golden Gate and enrolled at a different law school, this Court could not grant meaningful equitable relief if it determined that Golden Gate violated section 94367. While Karimi argues that declaratory judgment clarifying his rights under that statute might be of use if he enrolled at different law school, a judgment by this Court in this action would not be binding on any school except Golden Gate, and federal courts lack jurisdiction "'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Church of Scientology*, 506 U.S. at 12 (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). Accordingly, this Court has no authority to provide an advisory opinion on the scope of a California statute to guide educational institutions that are not parties to this case and might never have any relationship with Karimi.

Karimi argues that Defendants waived their defense of mootness by failing to raise it in

their answer. This Court is aware of no decision holding that mootness is waived if not pleaded as an affirmative defense, and for good reason. From a practical perspective, cases can become moot at any time, including—as is the case here—after the parties' pleadings have been filed. *See Abdala*, 488 F.3d at 1063 (noting that mootness may arise "[a]t any stage of the proceedings"). More importantly, mootness describes a limitation of the federal courts' jurisdiction under the United States Constitution. *See Am. Rivers*, 126 F.3d at 1123. Defects in subject matter jurisdiction "cannot be forfeited or waived." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009). Defendants' failure to plead mootness as an affirmative defense is of no consequence.

Because meaningful relief can no longer be granted under section 94367, Karimi's claim under that statute is moot, and Defendants are entitled to judgment of dismissal on that claim, even without taking into account the imposition of evidentiary sanctions.

## D.    Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

Under California law, the "cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004). "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000). Although the covenant "requires mutual fairness in applying a contract's actual terms, it cannot substantively *alter* those terms." *Id.* at 327.

California courts have characterized the relationship between students and universities— including the terms of that relationship described in student handbooks—as essentially contractual, but have also cautioned "that contract law should not [necessarily] be strictly applied." *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 824 (2007); *see also Banga v. Kanios*, No. 16-cv-04270-RS, 2017 WL 6731639, at *6–7 (N.D. Cal. Dec. 29, 2017). Courts are deferential to university disciplinary processes, recognize that "[u]niversities are entitled to some leeway in modifying their programs from time to time to exercise their educational

19

responsibility properly," and "have been reluctant to apply contract law to general promises or expectations." *Id.* at 824–26. "'There is a widely accepted rule of judicial nonintervention into the academic affairs of schools.'" *Id.* at 825 (quoting *Paulsen v. Golden Gate Univ.* 25 Cal. 3d 803, 808 (1979)). On the other hand, courts have "not been hesitant to apply contract law when the educational institution makes a specific promise to provide an educational service, such as a failure to offer any classes or a failure to deliver a promised number of hours of instruction." *Id.* at 826.[6]

In a somewhat related doctrine of deference to university procedures, students must exhaust a university's internal dispute resolution processes before bringing a civil claim based on a decision subject to such a process. The California courts broadly apply the requirement of exhausting internal remedies to claims against a wide range of organizations, including "hospital[s], voluntary private or professional association[s], . . . public entit[ies]," labor unions, fraternal organizations, and universities. *Rojo v. Kliger*, 52 Cal. 3d 65, 86 (1990). At least one appellate court decision has explicitly stated that the rule applied to a claim by a student challenging disciplinary decisions by a private university. *Gupta v. Stanford Univ.*, 124 Cal. App. 4th 407, 411 (2004) ("[F]ailure to exhaust administrative remedies is a proper basis for demurrer."). Policy considerations underlying the requirement to exhaust internal remedies include judicial economy, respect for organizational expertise, and the possibility of mitigating damages if an organization quickly corrects a decision that it determines to have been erroneous, among others. *See Rojo v. Kliger*, 52 Cal. 3d at 85–86 (citing *Westlake Cmty. Hosp. v. Superior Court*, 17 Cal. 3d 465 (1976)). Even where a plaintiff satisfies this requirement by pursuing an organization's internal quasi-judicial procedures, the plaintiff must challenge any such decision through a petition for administrative mandamus under section 1094.5 of the California Code of Civil Procedure, not through a separate civil action seeking to relitigate the same issues. *Gupta*, 124 Cal. App. 4th at 411. "The remedy of administrative mandamus applies to any organization

---

[6] Although Karimi objected to the cancellation of one meeting of his torts class and to the use of class time for purposes other than formal instruction, he has identified no contractual promise that Golden Gate failed to fulfill regarding hours of instruction.

20

that provides for an evidentiary hearing." *Id.*

### 1. Claims Based on Purportedly Wrongful Disciplinary Charges

Here, Golden Gate's handbook provided for a formal hearing on disciplinary charges before a panel of faculty members and one student, with an opportunity for Karimi to present evidence, a procedure for Karimi to challenge the impartiality of panel members, and the burden of proof on Golden Gate to prove its case, among other procedural safeguards. Defs.' Ex. A (Handbook) at 107–10. Golden Gate therefore provided the sort of quasi-judicial tribunal that Karimi was required to exhaust to challenge Assistant Director Devoy's determination that Karimi violated multiple provisions of the handbook. *See* Defs.' Ex. Z (December 20, 2017 email from Devoy to Karimi transmitting a "Disciplinary Action Letter" concluding that Karimi violated standards of student conduct). The Disciplinary Action Letter that Devoy sent to Karimi explained Karimi's option to pursue a formal hearing through Golden Gate's internal disciplinary process. *See id.* Karimi instead sought unsuccessfully to enjoin any disciplinary proceedings, stipulated to postpone such proceedings, and ultimately agreed to withdraw from Golden Gate without reaching any resolution of the internal disciplinary process. Having declined to exhaust that process, Karimi is not entitled to challenge before the Court Golden Gate's determination that it had grounds for disciplinary action. To the extent that Karimi's contract claims are based on such a theory, Defendants are entitled to summary judgment. The same is true of any theory of damages based on Karimi's inability to obtain a degree from Golden Gate, or to obtain a law degree within three years of beginning his studies at Golden Gate, as the question of what sanction could be imposed for Karimi's violation of student conduct standards was entrusted to the process that Karimi declined to pursue.

Karimi argues that he "lost this year [towards obtaining a law degree] regardless of" the outcome of disciplinary proceedings because even if he ultimately prevailed in Golden Gate's internal process, it would not change the fact that he was suspended during necessary first-semester classes. *See* Opp'n to MSJ at 9. This argument is unavailing because it is based on the assumption that Karimi would have prevailed under that process and Golden Gate lacked valid reasons to suspend or expel him. Having failed to exhaust the process, Karimi is not entitled to

21

such a presumption.

Because these aspects of Karimi's claims are barred by his failure to exhaust internal procedures, the Court need not decide whether an incorrect decision under Golden Gate's procedures could support a claim for breach of contract. *But see Kashmiri*, 156 Cal. App. 4th at 824–25 (noting that "courts have often deferred to any challenge based in contract to universities' academic and disciplinary decisions").

### 2. Claims Based on Purported Procedural Defects

One aspect of Karimi's contract claims, however, is not necessarily barred by the exhaustion analysis set forth above, but Defendants are nevertheless entitled to judgment because the handbook is not amenable to Karimi's interpretation of it. Karimi argues that Golden Gate did not follow its own procedures for imposing an interim suspension. Those procedures read as follows:

> Pending action on charges, a student's status as a member of the University community will not be altered or his or her right to attend classes or perform his or her prescribed duties suspended, except under any of the following circumstances as determined by the Assistant Director and approved by the dean:
>
> 1. To ensure the safety and well-being of members of the University community or preservation of University property;
>
> 2. To ensure the student's own physical or emotional safety and well-being;
>
> 3. If the student poses a credible threat of disruption of or interference with the normal operations of the University; and/or
>
> 4. If the student fails to attend the scheduled hearing on the disciplinary charges.
>
> During the interim suspension, the student shall be denied access to University facilities including classes, and/or all other University activities or privileges for which the student might otherwise be eligible, and/or other restrictions, as the Assistant Director may determine.

Defs.' Ex. A (Handbook) at 110, § XVI.J.

According to Karimi, his interim suspension violated the handbook procedures because: (1) no formal charges were pending when he was first suspended; and (2) Niedwiecki, the dean, had no authority to suspend him unilaterally rather than acting on a determination by the Assistant

22

Director as called for in the handbook. *See* FAC at 10–13; Opp'n to MSJ at 2, 9–10. Defendants do not address these arguments, and it is not clear that Defendants' exhaustion argument applies to this claim, because Defendants have not explained why a disciplinary hearing committee would have reason to consider any procedural errors in imposing an interim suspension that applied only "[p]ending action on charges" and thus would have reached its end when a decision on those charges was reached, regardless of the outcome.

Karimi is correct that the handbook, by its terms, calls for a decision by the Assistant Director and approval by the dean, rather than a unilateral decision by the dean. Based on the available record, the Assistant Director position appears to have been vacant at the time Niedwiecki placed Karimi on interim suspension. Defendants do not dispute Karimi's assertion that the position was vacant, which is consistent with Devoy's declaration that he became Assistant Director in the fall of 2017. *See* Opp'n at 9–10; Devoy Decl. ¶ 2.

The Court interprets the interim suspension provision of the handbook as allowing the dean to place a student on interim suspension if the Assistant Director position is vacant. The purpose of the provision is to ensure safety and prevent interference with operations when the university determines that a student must be removed from campus on a provisional basis more quickly than a decision could be reached through the full disciplinary process. Taking into account that purpose, as well as the deference given to educational institutes in managing student discipline, it would be untenable to interpret the handbook as disallowing interim suspension while the Assistant Director position is vacant. Instead, it is appropriate in that event for the dean—who even under normal circumstances holds the right of final approval of interim suspensions—to act unilaterally, as Niedwiecki did here.

The introductory phrase "[p]ending action on charges" also does not clearly require that formal charges must be filed before a student may be placed on interim suspension. For much the same reasons—the purpose of interim suspension, and deference to university discipline—the Court concludes that the phrase merely qualifies interim suspension as applicable before a final decision is reached, and does not require charges to be filed before interim suspension may be imposed. Karimi therefore cannot prevail on his contract claims based on Niedwiecki's unilateral

23

decision to place him on interim suspension before filing formal disciplinary charges, because the handbook implicitly permitted Niedwiecki to do so. Defendants' motion for summary judgment on these claims is GRANTED.[7]

### E. Defamation and False Light

Under California law, "[d]efamation constitutes an injury to reputation; the injury may occur by means of libel or slander." *Shively v. Bozanich*, 31 Cal. 4th 1230, 1242 (2003) (citing Cal. Civ. Code § 44). Karimi's claim here implicates the doctrine of libel rather than slander because it is based on a written communication: Niedwiecki's email to the Golden Gate community. Libel consists of "a written communication that is false, that is not protected by any privilege, and that exposes a person to contempt or ridicule or certain other reputational injuries." *Id.* (citing Cal. Civ. Code § 45). California courts have held that "'[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action.'" *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1264 (2017) (quoting *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1385 n.13 (1999)).[8]

Substantial truth is a defense to defamation. Even if a statement contains minor

---

[7] Moreover, any claims based on procedural defects in imposing interim suspension would likely have resulted in no provable economic loss. Such claims would be limited to Karimi's loss of campus privileges until the procedural defects were cured, because as discussed above, Karimi's failure to exhaust internal adjudication of the charges against him bars any damages related to his ultimate separation from Golden Gate. The purported procedural defects were cured no later than December 20, 2017, at which time formal charges had been filed and Devoy, as stated in his declaration bearing that date, concurred with Niedwiecki's decision that interim suspension was appropriate. Devoy Decl. Re Prelim. Inj. (dkt. 27) ¶ 32. Karimi was reimbursed for all of the tuition he paid to attend Golden Gate plus interest, and there is no evidence in the record of any other economic damages resulting from his loss of student privileges during interim suspension. Niedwiecki Decl. ¶ 102; Defs.' Exs. HH, II.

[8] Karimi briefly argues that Defendants are barred under Rule 8 of the Federal Rules of Civil Procedure from defending against his false light claim because they "d[id] not dispute [his] false light claim in [Defendants'] response to [Karimi's] first amended complaint." Opp'n to MSJ at 13. Defendants in fact denied Karimi's allegations regarding that claim. *See* Answer ¶ 8 ("As to the allegations asserted on page 15, lines 5-26, page 16, lines 1-28, and page 17, lines 1-8, under the heading 'Fourth Cause of Action Defamation/False Light', [Defendants] den[y] each and every allegation asserted therein."). Rule 8 does not prevent Defendants from obtaining summary judgment on this claim. The same is true for the other claims at issue, where Karimi raises similar conclusory arguments under Rule 8 that disregard Defendants' answer to his first amended complaint.

24

inaccuracies, the statement is not actionable "unless it would have a different effect on the mind of the reader from that which the truth would have produced." *Id.* at 1263 (discussing *Carver v. Bonds*, 135 Cal. App. 4th 328, 344–45 (2005)). The record does not demonstrate any material dispute that Niedwiecki's email to the Golden Gate community was substantially accurate.

Niedwiecki's September 18, 2017 email to the Golden Gate community regarding Karimi's suspension reads as follows:

> GGU Students,
>
> I am writing because there has been some inquiry about a matter that happened last Friday morning.
>
> At approximately 9:10 AM, we requested a law school student, who in our judgment has been demonstrating some behavior issues at the University, to leave campus for an indefinite period of time. The student has left the campus on his own accord without resistance. We plan to communicate with this student while he remains off campus.
>
> You might have observed some campus security or SF police near the Hub at that time, but there was no known safety concern. We are continuing with heightened safe [sic] and security procedures for the time being.
>
> If you have any questions about this situation, please don't hesitate to contact me at [telephone number].
>
> Thank you all for your patience,
>
> Anthony Niedwiecki
> Dean, GGU Law School

Defs.' Ex. N.

The email includes the following assertions: (1) that a law student had "in our judgment . . . been demonstrating some behavior issues at the University"; (2) that Golden Gate "requested [that the] law student . . . leave campus for an indefinite period of time"; (3) that the student "left campus on his own accord and without resistance"; (4) that Golden Gate "plan[ned] to communicate with this student while he remains off campus"; (5) that members of the community "might have observed campus security or SF police near the Hub at that time"; (6) that "there was no known safety concern"; and (7) that Golden Gate was "continuing with heightened safe [sic] and security procedures for the time being." *Id.* The assertions numbered here as 3 and 5 are entirely consistent with Karimi's telling of the event. *See* Karimi MSJ Decl. ¶¶ 12–13 (stating that

Karimi left campus and police arrived near campus at his request). With respect to assertions 4, 6, and 7, Karimi does not dispute that there was no known safety concern, and has presented no evidence contradicting Niedwiecki's statement that Golden Gate planned to communicate with Karimi while he was off campus and to continue with heightened security procedures.

Karimi's arguments focus on whether he displayed behavior issues at Golden Gate (as opposed to sending emails from off campus), whether Golden Gate requested that he leave campus, and whether Niedwiecki's email generally gave the impression that Karimi was dangerous.

Niedwiecki's assertion regarding Karimi's "behavior issues" is framed as an opinion ("in our judgment"). *See* Defs.' Ex. N. Statements of opinion are not generally actionable, but "where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation." *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696 (2012); *see also Wong v. Jing*, 189 Cal. App. 4th 1354, 1370 (2010). Whether the statement could be construed as implying an assertion of fact is a question of law for the Court. *Summit Bank*, 206 Cal. App. 4th at 696. Assuming for the sake of argument that Niedwiecki's statement that a law student had "in our judgment . . . been demonstrating some behavior issues" implies any factual assertion, it suggests at most that Karimi behaved in an unusual or confrontational manner on campus. The record does not support any factual dispute as to whether Karimi behaved confrontationally on campus, or at least in the immediate vicinity of campus. As one example, Karimi himself asserts that he called the police to report another student who merely spoke to him unkindly and sat at the same table as him in the library. *See* Karimi MSJ Decl. ¶ 15; FAC at 18. Any factual assertion that might have been implied by Niedwiecki's statement was therefore accurate, and Niedwiecki's conclusion that such conduct constitutes "behavior issues" is an opinion that cannot support a defamation claim.

Karimi asserts in his declaration that Koperski never instructed him to leave campus, Karimi MSJ Decl. ¶ 2, and asserted in response to Niedwiecki's email that Niedwiecki "directed" rather than "requested" that he leave, Defs.' Ex. O, although he does not argue in his opposition brief that those distinction supports his defamation claim. *See* Opp'n at 10–13. The Court addresses these purported discrepancies in an abundance of caution. Even if Koperski did not

26

verbally instruct Karimi to leave, Niedwiecki's statement that "we requested a law student . . . to leave campus for an indefinite period" remains substantially accurate, because Koperski provided Karimi with Niedwiecki's suspension email instructing him to remain off campus. *See* Karimi MSJ Decl. ¶ 12; Defs.' Ex. M. The distinction between requesting and directing Karimi to remain off campus is not significant because Karimi has not explained why the assertion that he was "requested" to leave campus would have a more defamatory "effect on the mind of the reader from that which the truth [i.e., that he was instructed to remain off campus] would have produced." *See Jackson*, 10 Cal. App. 5th at 1263.

As for Karimi's argument that the email gave the general impression that Karimi posed a danger, *see* Opp'n at 11, any such implication would be at most an expression of Niedwiecki's opinion. Karimi has not identified a specific factual assertion that could be implied from that opinion. Taking into account Niedwiecki's statement in the email that "there was no known safety concern," Defs.' Ex. N, the Court concludes as a matter of law that the email did not imply a provably false assertion of fact—for example, that Karimi had threatened or engaged in violence—sufficient to support a defamation claim. *See Summit Bank*, 206 Cal. App. 4th at 696; *Wong*, 189 Cal. App. 4th at 1370.

Because Niedwiecki's email did not state or imply any materially false factual assertion, Defendants are entitled to summary judgment on Karimi's claim for defamation and false light, even without taking into account the imposition of evidentiary sanctions.

Moreover, as a separate and sufficient reason to grant summary judgment, Niedwiecki's email was protected by California's qualified common interest privilege. That privilege protects assertions made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." Cal. Civ. Code § 47. Niedwiecki and the Golden Gate community shared a common interest in communicating why police were on campus, and there is no evidence from which a finder of fact could conclude that Niedwiecki's email was motivated by malice towards Karimi—particularly in light of the fact that

27

the email did not identify Karimi by name. Because the communication was privileged, Defendants are entitled to summary judgment on this claim.

The Court does not reach Defendants' argument that Karimi has not presented evidence that any recipient of the email understood it as referring to Karimi. *See* Reply at 5.

### F.    Public Disclosure of Private Facts

The California Supreme Court has "set forth the elements of the public-disclosure-of-private-facts tort as follows: '(1) public disclosure, (2) of a private fact, (3) which would be offensive and objectionable to the reasonable person, and (4) which is not of legitimate public concern.'" *Taus v. Loftus*, 40 Cal. 4th 683, 717 (2007) (quoting *Shulman v. Group W Prods.*, 18 Cal. 4th 200 (1998)). To meet this test, the disclosure at issue must reveal "'*intimate details* of plaintiffs' lives.'" *Id.* at 718 (quoting *Coverstone v. Davis*, 38 Cal. 2d 315, 323 (1976)).

Karimi argues that Niedwiecki's email meets this standard because it disclosed that Karimi had been suspended, which Karimi contends is an academic record protected by FERPA. *See* Opp'n at 13–14. Karimi cites no authority for the proposition that any record governed by FERPA—which does not itself provide a private right of action—constitutes the sort of "intimate detail" protected from disclosure under California tort law. Even accepting Karimi's premise for the sake of argument, Niedwiecki's email did not disclose that Karimi had been suspended or that any formal disciplinary action had occurred. The email stated only that Golden Gate had "*requested* a law student . . . to leave campus for an indefinite period of time." Defs.' Ex. N (emphasis added). No reasonable finder of fact could conclude that the email disclosed intimate private details of Karimi's life. Defendants are therefore entitled to summary judgment on this claim, even without taking into account the imposition of evidentiary sanctions.[9]

_____

[9] Although the parties have not cited any decision apply the common interest privilege to bar a claim for public disclosure of private facts, that privilege very likely applies here as separate basis for summary judgment. *See Jacob B v. County of Shasta*, 40 Cal. 4th 948, 960–62 (2007) (holding that the litigation privilege, which is codified as a separate subsection of the same statute as the common interest privilege, applies to claims for invasion of privacy, even where such claims are brought under the California constitution); *Lerette v. Dean Witter Org., Inc.*, 60 Cal. App. 3d 573, 595–96 (1976) ("To allow appellant to proceed with [an intentional infliction of emotional distress] cause of action would substantially defeat the purpose of the privilege enunciated in section 47. It would exalt a judicially derived cause of action . . . above clear legislative intention and operate as a severe deterrent to communications otherwise protected.").

United States District Court
Northern District of California

### G.    Intentional Infliction of Emotional Distress

Karimi's final claim is for intentional infliction of emotional distress.  The elements of such a claim are:

> (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . . A defendant's conduct is "outrageous" when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community. . . . And the defendant's conduct must be intended to inflict injury or engaged in with the realization that injury will result.

*Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (citations and internal quotation marks omitted). The degree of injury required is also high: "Severe emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it," and assertions that a plaintiff "suffered discomfort, worry, anxiety, upset stomach, concern, and agitation" do not meet that bar. *Id.* at 1051 (citations and internal quotation marks omitted; alteration in original).

The only conduct Karimi identifies in his opposition brief to support this claim is Niedwiecki "totally disregard[ing] student handbook policy and de facto expell[ing Karimi] without due process and jeopardizing [his] dream of being a lawyer." Opp'n 14–15.

Niedwiecki did not "de facto expel" Karimi without an opportunity for process.  The student handbook provided a process for a hearing on the disciplinary charges eventually filed against Karimi, but Karimi declined to participate in that process, unsuccessfully sought an injunction against it, and agreed with Golden Gate to postpone the disciplinary process until he eventually agreed to withdraw from Golden Gate after being admitted to a different law school. Karimi was entitled to process before he could have been expelled, and was presented with opportunities to take advantage of that process.  Because Karimi failed to exhaust internal university processes to challenge the grounds for his suspension, he may not do so here.

The Court need not address whether a finder of fact could conclude from this record that any of Defendants' conduct was "outrageous" as that term is used in the context of an intentional infliction of emotional distress claim.  Even if Karimi could both show outrageous conduct and

overcome his failure to exhaust internal remedies, the only evidence of subjective distress is Karimi's own declaration, and Defendants were unable to test that evidence through discovery because Karimi refused to appear for a deposition. In light of the Court's decision to exclude Karimi's declaration under Rule 37, there is no evidence in the record from which a finder of fact could conclude that Karimi suffered "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *See Hughes*, 46 Cal. 4th at 1051. Defendants are therefore entitled to summary judgment on this claim.

## IV. CONCLUSION

Defendants' motions are GRANTED as set forth above. The Clerk shall enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

Dated: February 13, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge